**Service of Process
Transmittal**
03/14/2016
CT Log Number 528817027

TO:     Brooks Gruemmer
        McDermott Will & Emery LLP
        227 West Monroe Street
        Chicago, IL 60606-5096

RE:     **Process Served in Delaware**

FOR:    OUTDOORS ACQUISITION CO LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

TITLE OF ACTION:              AVERY OUTDOORS LLC, etc., Pltf. vs. PEAK ROCK CAPITAL, LLC and OUTDOORS
                              ACQUISITION CO, LLC, Dfts.

DOCUMENT(S) SERVED:           Attachment, Summons, Return, Verified Complaint, Exhibit(s)

COURT/AGENCY:                 30th JUDICIAL DISTRICT SHELBY COUNTY CHANCERY COURT, TN
                              Case # CH160404

NATURE OF ACTION:             By charging these exorbitant, excessive and impermissible fees in its pay-off
                              statement, OAC violated the implied covenant of good faith and fair dealing that is
                              a part of all contractual obligations in the State of Tennessee

ON WHOM PROCESS WAS SERVED:   The Corporation Trust Company, Wilmington, DE

DATE AND HOUR OF SERVICE:     By Certified Mail on 03/14/2016 postmarked on 03/08/2016

JURISDICTION SERVED :         Delaware

APPEARANCE OR ANSWER DUE:     Within 30 days from the date this summons is served upon you

ATTORNEY(S) / SENDER(S):      R. Campbell Hillyer
                              BUTLER SNOW LLP
                              6075 Poplar Avenue, Suite 500
                              Memphis,, TN 38119
                              901-680-7326

ACTION ITEMS:                 SOP Papers with Transmittal, via  Fed Ex 2 Day , 782597385632

                              Email Notification,  Brooks Gruemmer  bgruemmer@mwe.com

SIGNED:                       The Corporation Trust Company
ADDRESS:                      1209 N Orange St
                              Wilmington, DE 19801-1120
TELEPHONE:                    302-658-7581



Page 1 of  1 / LS

Information displayed on this transmittal is for CT
Corporation's record keeping purposes only and is provided to
the recipient for quick reference. This information does not
constitute a legal opinion as to the nature of action, the
amount of damages, the answer date, or any information
contained in the documents themselves. Recipient is
responsible for interpreting said documents and for taking
appropriate action. Signatures on certified mail receipts
confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
03/11/2016
CT Log Number 528801784

TO: Justin Wang
Peak Rock Capital LLC
13413 Galleria Circle, Suite Q-300
Austin, TX 78738

RE: **Process Served in Texas**

FOR: Peak Rock Capital LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | AVERY OUTDOORS LLC, etc., Pltf. vs. PEAK ROCK CAPITAL, LLC and OUTDOORS ACQUISITION CO, LLC, Dfts. Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons, Return, Verified Complaint, Exhibit(s) |
| **COURT/AGENCY:** | SHELBY COUNTY - THIRTIETH JUDICIAL DISTRICT COURT - CHANCERY, TN Case # CH1604042 |
| **NATURE OF ACTION:** | Defendant breached its obligations under the agreement by exercising its right to ensure service |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 03/11/2016 postmarked on 03/08/2016 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days from the date this summons is served upon you |
| **ATTORNEY(S) / SENDER(S):** | R. Campbell Hillyer BUTLER SNOW LLP 6075 Poplar Avenue Suite 500 Memphis, TN 38119 (901) 680-7200 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 782577502467 |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 1999 Bryan St Ste 900 Dallas, TX 75201-3140 |
| **TELEPHONE:** | 214-932-3601 |

Page 1 of  1 / BS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



UNITED STATES POSTAGE
PITNEY BOWES
02 1P    $ 009.43⁰
0003194051    MAR 08 2016
MAILED FROM ZIP CODE 38137

# BUTLER | SNOW

*Post Office Box 171443 • Memphis, TN 38187-1443*

BUTLER SNOW LLP

Peak Rock Capital, LLC
c/o Register Agent
CT Corporation System
1999 Bryan Street, Suite 900
Dallas, TX 75201

CERTIFIED MAIL®

7015 0640 0002 7455 8637

| STATE OF TENNESSEE<br>30th JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS**\*\* | DOCKET NUMBER<br>CH- 16-0404-2 |
|---|---|---|

| Plaintiff | Defendant |
|---|---|
| Avery Outdoors LLC f/k/a Banded Finance LLC | PEAK ROCK CAPITAL, LLC |

TO:     (NAME AND ADDRESS OF DEFENDANT)

Peak Rock Capital, LLC

c/o Register Agent,  C T Corporation System

1999 Bryan Street, Suite 900

Dallas Texas 75201

Method of Service:

☐ Shelby County Sheriff
☐ Private Process Server
☐ Out of County Sheriff
☐ Secretary of State\*
☐ Comm. Of Insurance\*
☒ Certified Mail
☐ Other
        \*Attach Required Fees

You are summoned to defend a civil action filed against you in the Chancery Court of Shelby County, Tennessee. Your defense to this action must be made within thirty (30) days from the date this summons is served upon you. You must file your defense with the Clerk of the Court and send a copy to the Plaintiff/Plaintiff's attorney at the address listed below. If you fail to defend this action within thirty (30) days of service, judgment by default may be rendered against you for the relief sought in the Complaint. Questions regarding this summons and the attached documents should be addressed to the Attorney/Plaintiff listed below.

| Attorney for Plaintiff or Plaintiff if filing Pro Se:<br>(Name, address & telephone number)<br><br>R. Campbell Hillyer, Esq. BUTLER SNOW LLP<br><br>6075 Poplar Avenue, Suite 500<br><br>Memphis, TN 38119<br><br>901-680-7326 | ISSUED   7   of   March   , 20  16<br><br>Donna L. Russell, Clerk & Master<br><br>By: _____<br>        Deputy Clerk & Master<br><br>140 Adams, Room 308   Memphis, TN 38103 |
|---|---|
| TO THE SHERIFF:<br><br>_____<br><br>_____ | Came to hand<br><br>_____ day of _____, 20 ____<br><br>Sheriff |

| CERTIFICATION (IF APPLICABLE) | |
|---|---|
| I, Donna L. Russell, Clerk & Master of the Chancery Court in the State of Tennessee, Shelby County, do certify this to be a true and correct copy of the original summons issued in this case. | Donna L. Russell, Clerk & Master<br><br>By: _____<br>        D. C. & M. |

\*\*Submit one original and one copy for each defendant to be served.

♿ If you need assistance or accommodations because of a disability, please call the ADA Coordinator at (901)222-2341.

**Notice of Personal Property Exemption:**
TO THE DEFENDANT(S):
        Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state docket number on list.

## RETURN OF SERVICE OF SUMMONS

I hereby certify that I **HAVE** served the within summons:

By delivering on the _____ day of _____, 20_____ at _____ am/pm a copy of the

summons and a copy of the Complaint to the following Defendant:_____

at _____

_____        By: _____
Signature of person accepting service                              Sheriff or other authorized person to serve process

## RETURN OF NON-SERVICE OF SUMMONS

I hereby certify that I **HAVE NOT** served the within summons:

To the named defendant _____because _____

is (are) not to be found in this county after diligent search and inquiry for the following reason(s):_____.

This _____day of _____, 20 _____

                                                By: _____
                                                         Sheriff or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20_____, I sent, postage prepaid, by registered return receipt

mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case CH-_____ to the

defendant _____. On the _____ day of _____, 20_____, I

received the return receipt, which had been signed by _____ on the _____ day of _____,

20 _____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| | |
|---|---|
| Sworn to and subscribed before me on this _____day of _____, 20_____.  Signature of _____Notary Public or _____Deputy Court Clerk: _____  My Commission Expires: | Signature of Plaintiff, Plaintiff's attorney or other person authorized by statute to serve process.  _____ |
|       ATTACH RETURN  RECEIPT HERE  (IF APPLICABLE) | |

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

AVERY OUTDOORS LLC
f/k/a BANDED FINANCE LLC,

      Plaintiff,

v.                              Cause No. _CH-16-0404_

PEAK ROCK CAPITAL, LLC, and                  _pt 2_
OUTDOORS ACQUISITION CO, LLC

      Defendants.

---

### VERIFIED COMPLAINT FOR MONEY DAMAGES

---

      COMES NOW, Avery Outdoors LLC f/k/a Banded Finance, LLC ("Banded"), by and through its undersigned counsel of record, and for its Verified Complaint against Defendants Peak Rock Capital, LLC ("Peak Rock") and Outdoors Acquisition Co., LLC ("OAC"), hereby states as follows:

### PARTIES

      1.      Banded is a limited liability company organized and existing under the laws of the State of Arkansas with its principal place of business in Springdale, Arkansas.

      2.      Peak Rock is a Texas LLC whose principal place of business is located at 13413 Galleria Circle, Suite O-300, Austin Texas 78738.  It may be served by delivering a copy of this Complaint and Summons upon its registered agent, C T Corporation System at 1999 Bryan Street, Suite 900, Dallas Texas 75201.

      3.      OAC is a Delaware LLC whose principal place of business is located at 1209 North Orange Street, Wilmington DE, 19801.  It can be served by delivering a copy of this

Complaint and Summons upon its registered agent, the Corporation Trust Company, at 1209 North Orange Street, Wilmington DE 19801.

4.      Upon information and belief, OAC is wholly owned, controlled, and/or operated by Defendant Peak Rock.

## JURISDICTION AND VENUE

5.      Jurisdiction and venue are proper in this Court pursuant to Tenn. Code Ann. §§ 16-11-102, 16-11-103, 16-11-115, 20-2-222, 20-2-223, and 20-4-101.

6.      Jurisdiction and Venue are also proper because both Defendants have previously submitted to the exclusive jurisdiction of this Court through their involvement in the related receivership action before this Court styled *SunTrust Bank v. Avery Outdoors, Inc.*, Cause No. CH-14-1667-1 (hereinafter the "Receivership Action").

## FACTS AND BACKGROUND

7.      On June 11, 2008, Avery Outdoors, Inc. ("Avery") executed a Revolving Promissory Note in the original principal amount of $8,000,000 (the "SunTrust Note"), Loan and Security Agreement, and Intellectual Property Security Agreement all in favor of SunTrust Bank ("SunTrust").[1]

8.      The SunTrust Note and the Loan and Security Agreement detail the allowable fees the holder of the SunTrust Note is contractually entitled to charge Avery.

9.      The SunTrust Note states, in pertinent part, as follows:

> [Avery] shall pay the holder hereof, upon demand, all expenses and costs, including but not limited to, reasonable attorney's fees, that the holder hereof incurs (i) in collecting or attempting to collect the indebtedness evidenced by this Promissory Note, (ii) in enforcing the Loan Agreement or any deed of trust, mortgage, assignment of rents and leases, security agreement or other

---

[1] A true and correct copy of the SunTrust Note, Loan and Security Agreement, and Intellectual Property Security Agreement are attached hereto as Exhibit A.

> collateral that secures this Promissory Note or any guaranty thereof (herein together "Security Documents"), (iii) in protecting the collateral encumbered by the Security Documents, (iv) in defending or asserting the holder's rights in said collateral, and/or (v) with regard to any bankruptcy, reorganization or insolvency proceeding involving this Promissory Note, the Security Documents or said collateral.

*See* SunTrust Note, p. 2, Sec. (c), attached hereto as Ex. A.

10.    Section 12.10 of the Loan and Security Agreement also states as follows:

> In any action or proceeding between Borrower and Bank arising out of or relating to the Loan Documents, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs and expenses incurred, in addition to any other relief to which it may be entitled.

*See* Loan and Security Agreement, Sec. 12.10, attached hereto as Ex. A.

11.    On November 13, 2014, SunTrust commenced the Receivership Action by suing Avery for breach of the SunTrust Note, and requesting, among other things, appointment of a Receiver.

12.    On November 14, 2014, John L. Ryder (hereinafter the "Receiver") was appointed by this Court as the Receiver for Avery.

13.    The Receiver determined that a structured sale of the assets of Avery was in the best interest of the Receivership Estate.

14.    The Receiver implemented a sales procedure and requested that interested parties submit Letters Of Intent ("LOI") detailing the nature of any purchase proposal.

15.    On or about March 28, 2015, Peak Rock submitted a LOI for the purchase of certain assets of the Receivership Estate.

16.    On or about April 2, 2015, SunTrust assigned all of its interests, rights and remedies under the SunTrust Note to OAC.

3

17.    On or about April 14, 2015, Peak Rock submitted an extensive due diligence request list to the Receiver in order to conduct its pre-purchase due diligence for a potential acquisition of Avery.

18.    On or about April 22, 2015, OAC notified the Receiver by letter that, as of April 2, 2015, the indebtedness and other obligations of Avery under the SunTrust Note totaled $1,544,997.03.[2]

19.    The April 22, 2015 loan payoff amount included the following itemized sums, allegedly incurred as of April 2, 2015:

| Principal | $1,461,394.94 |
| Interest | $7,299.50 |
| Other Fees and Expenses | $76,302.59 |
| TOTAL | $1,544,997.03 |

20.    The April 22, 2015 loan payoff letter from OAC also claimed "additional fees and expenses (including without limitation attorneys' fees and expenses)" that had been incurred since April 2, 2015. The letter did not disclose, however, any amounts or details regarding such fees.

21.    On April 22, 2015, OAC also notified the Receiver by separate letter that it intended to conduct a public sale of the collateral secured by the SunTrust Note on May 11, 2015, as provided for in the Tennessee Uniform Commercial Code § 47-9-101 *et seq.* ("TUCC").[3]

22.    The TUCC sale would have resulted in the assets of Avery being sold at a depressed liquidation value.

23.    On April 30, 2015, Banded submitted a LOI to the Receiver to provide short term

---

[2] A copy of the April 22, 2015 "Payoff" letter is attached hereto as Exhibit B.
[3] A copy of the April 22, 2015 Disposition of Collateral letter is attached hereto as Exhibit C.

4

financing which would enable Avery to pay off the SunTrust Note, now owned by OAC, and secure needed inventory for the 2015 hunting season.

24.     The short term loan from Banded (hereinafter the "Banded Loan") would permit Avery to continue business operations, prevent the scheduled TUCC sale from going forward, and enable the Receiver to proceed with the planned structured sale.

25.     To close the Banded Loan, the Receiver requested that OAC provide the final payoff amount for the indebtedness owed under the SunTrust Note.

26.     On or about May 7, 2015 and in response to the Receiver's request for a final pay-off amount, OAC sent the Receiver a pay-off statement for the following sums:[4]

    a.  principal and interest accrued as of April 2, 2015 totaling $1,448,198.33;
    b.  legal and other fees through April 2, 2015 totaling $76,302.59;
    c.  accrued interest from April 2, 2015 through May 8, 2015 totaling $9,804.32 at an interest rate of 6.0467% per day; and
    d.  "estimated" legal and other fees from April 2, 2015 through May 8, 2015 totaling $385,210.29.

27.     The "estimated" Legal and Other fees incurred from April 2, 2015 through May 8, 2015 totaling $385,210.29 was further itemized on the pay-off bill as follows:

    a.  McDermott, Will & Emery    $90,000.00
    b.  Burr Forman    $65,000.00
    c.  Mackinac Partners    $68,056.12
    d.  Sprock Capital Advisory    $40,000.00
    e.  Outdoor Acquisition Co Expenses    $20,000.00
    f.  Collateral Evaluation & Assessment Fee    $100,000.00
    g.  Late Fee on Interest    $2,154.17

28.     At no point were these newly claimed ("legal and other") fees of $385,210.29 previously demanded or disclosed by OAC.

29.     The entirety of the $385,210.29 was incurred *after* the OAC acquisition of the SunTrust Note on April 2, 2015 and thus over the course of only five weeks.

---

[4] A copy of the payoff amount claimed as of May 8, 2015 is attached hereto as Exhibit D.

30.     Upon information and belief, the post-April 2, 2015 fees were incurred not as a result of OAC's enforcement of any claimed rights under the SunTrust Note; but rather, as a result of the pre-purchase due diligence that was performed by Peak Rock as an interested purchaser of Avery.

31.     Upon receipt of OAC's May 7, 2015 pay-off statement, the Receiver objected to and disputed the alleged "estimated" fees and attempted to resolve the disputed fee issue, or alternatively, have the disputed fee amount escrowed, so that the Court could resolve the issue at a later date.

32.     OAC refused to reduce the fees or have the fees escrowed, and threatened to withhold a release of its lien unless the full $385,210.29 was paid.

33.     OAC was aware when it made its pay-off demand that Avery did not have sufficient cash reserves to continue to operate beyond July 31, 2015.  OAC was also aware Avery did not have sufficient time to litigate the disputed fees and close on the Banded Loan so that Avery could be sold through the structured sale and retain its value as a going concern.

34.     On May 7, 2015, the Court approved the Receiver's request to close the Banded Loan.

35.     On or about May 8, 2015, the Receiver paid OAC, under expressed protest and economic duress, the full amount of the claimed indebtedness owed under the SunTrust Note, including the excessive and impermissible fees of over $385,000.

36.     On June 10, 2015, the Receiver filed a motion to approve the sale of certain Avery assets to Banded as the best offer received by the Receivership Estate.

37.     On July 6, 2015, the Court entered an order approving the sale of certain Avery assets to Banded.

6

38.     As part of the Court approved sale and pursuant to the provisions of the Asset Purchase Agreement, Banded expressly acquired the right to pursue the claim of the Receivership Estate to recapture the excessive and impermissible fees which the Receiver previously paid to OAC under expressed protest and economic duress.

39.     As such, Banded is now the proper party to pursue this action against Defendants.

**COUNT I**
**UNJUST ENRICHMENT**

40.     Banded incorporates herein by reference all allegations made in all previous paragraphs.

41.     OAC acquired no greater rights under the SunTrust Note than SunTrust held prior to transferring the note to OAC on April 2, 2015.

42.     OAC claimed to have incurred over $385,000 in legal and other fees between April 2, 2015 and May 8, 2015.

43.     Upon information and belief, all or the vast the majority of these fees incurred after April 2, 2015 were incurred in connection with due diligence conducted by Peak Rock as an interested purchaser of Avery.

44.     No contractual provisions of the SunTrust Note permitted OAC to charge fees to Avery that were incurred or related to Peak Rock's due diligence as an interested purchaser of Avery.

45.     Avery has been injured by being forced to pay excessive and/or impermissible fees that are not contractually recoverable under the SunTrust Note.

46.     Peak Rock has been unjustly enriched by having its legal and other fees included in the SunTrust Note payoff amount and paid for by the Receiver.

**COUNT II**

## BREACH OF CONTRACT AND BREACH OF THE
## IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

47.     Banded incorporates herein by reference all allegations made in all previous paragraphs.

48.     OAC owed Avery a duty of good faith and fair dealing pursuant to the SunTrust Note it acquired.

49.     OAC was not permitted to charge any fees other than those allowed under the SunTrust Note.

50.     OAC obtained the SunTrust Note on April 2, 2015, and the pay-off date was May 8, 2015.

51.     During that five-week period, OAC "estimated" it incurred $385,210.29, in legal, accounting, and other expenses.

52.     Those fees were in addition to the alleged $76,302.59 in "legal and other" fees it had previously incurred as of April 2, 2015.

53.     By charging these exorbitant, excessive and impermissible fees in its pay-off statement, OAC violated the implied covenant of good faith and fair dealing that is a part of all contractual obligations in the State of Tennessee.

54.     OAC likewise breached the SunTrust Note by charging fees which Peak Rock incurred for conducting its due diligence as an interested purchaser of the assets of Avery and not related to any fees OAC was entitled to charge under the SunTrust Note.

55.     By breaching the SunTrust Note and violating the implied covenant of good faith and fair dealing as herein described, OAC caused Avery to suffer monetary damages.

## COUNT III
## ECONOMIC DURESS

8

56. Banded incorporates herein by reference all allegations made in all previous paragraphs.

57. The Receiver, on behalf of Avery, was forced to pay an exorbitant and excessive pay-off amount to OAC under economic duress. OAC did not have the right to demand payment for excessive and impermissible fees that were not related to or recoverable under the SunTrust Note.

58. At the time of the excessive pay-off demand, OAC and Peak Rock knew that the Receiver did not have the time to litigate the fee dispute and close the Banded Loan in order to avoid the TUCC sale.

59. The Receiver expressly disputed the demanded pay-off fees and attempted to have them escrowed, so that the Court could resolve the issue at a later date, but OAC refused to have the fees escrowed. OAC also refused to release its lien unless the pay-off amount, including the impermissible and/or excessive fees, was paid in full.

60. With full knowledge that the Receiver had no viable choice but to accept the improper payoff demand, OAC took advantage of Avery's dire financial situation to force Avery's hand and extort the impermissible fees.

61. Because the demand was wrongful and because Avery had no viable choice but to pay-off the excessive demand, Avery paid it under economic duress and suffered monetary damages.

## COUNT IV
## ACCOUNTING AND DISGORGEMENT

62. Banded incorporates herein by reference all allegations made in all previous paragraphs.

63. OAC, as the holder of the SunTrust Note only had a right to charge reasonable

attorney's fees in protecting and exercising its rights under the SunTrust Note.

64.     In OAC's April 22, 2015 and May 7, 2015 payoff statements, OAC claimed to have incurred $76,302.59 in "legal and other fees" as of April 2, 2015. These fees have never been itemized or substantiated.

65.     In its May 7, 2015, itemized pay-off charge, OAC "estimated" it had incurred $100,000.00 in collateral evaluation and assessment fees and another $20,000 in expenses during the five weeks it held the SunTrust Note, notwithstanding the fact that, prior to and during the entire duration of OAC's possession of the Note, a court appointed Receiver was in place for specifically this purpose. Upon information and belief, this charge is not related to OAC's rights under the SunTrust Note.

66.     Further, the itemized pay-off amount also included "estimated" charges totaling $108,056.12 for fees incurred from a financial advisory firm with experience in helping its clients turn around failing companies and a capital advisory company that provides accounting due diligence and other transaction advisory services. Upon information and belief, these fees were not related to OAC's rights under the SunTrust Note.

67.     Additionally, OAC "estimated" its attorneys were owed a total of $155,000.00 for approximately five weeks of work, during which time the only legal work related to its rights under the SunTrust Note was to notice and attempt a TUCC sale of Avery.

68.     These professional fees are excessive and/or unrelated to OAC's exercise of any contractual rights under the SunTrust Note.

69.     An accounting of the bills and invoices for the itemized services listed in the pay-off amount is necessary to ascertain whether these "legal and other" fees were properly charged by OAC.

10

70.     The Receiver previously demanded an accounting of the aforementioned fees from OAC, but OAC failed to render such an accounting.

71.     Accordingly, Banded respectfully asks this Court to conduct an accounting on all fees charged by OAC to determine the amount of fees that are (1) excessive and unreasonable; and/or (2) impermissible under the SunTrust Note.

## **RELIEF DEMANDED**

WHEREFORE, PREMISES CONSIDERED, Banded respectfully demands that:

1.     The Court order a detailed accounting of the "legal and other" fees charged to Avery by OAC to determine:

> (a) Whether any portion of the claimed fees was related to Peak Rock's due diligence conducted as an interested purchaser of Avery and therefore not appropriately charged under the terms of the SunTrust Note; and/or

> (b) Whether any portion of the fees was unreasonably excessive and therefore not recoverable;

2.     The Court order Defendants to immediately disgorge any unreasonably excessive or impermissible fees;

3.     The Court order Defendants to pay Banded's legal fees related to this present suit; and

4.     The Court order any additional relief that it deems appropriate in this case.

## VERIFICATION

The undersigned verifies under penalty of perjury that the facts stated in this Verified Complaint are true and correct to the best of their information and belief.

John L. Ryder, Court Appointed Receiver
for Avery Outdoors, Inc.
Chancery Court of Shelby County,
Tennessee Case No. CH-14-1667-1

Dated: ~~February~~ MARCH 3, 2016

Respectfully submitted,

**BUTLER SNOW LLP**

R. Campbell Hillyer (22124)
Michael C. McLaren (28277)
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
(901) 680-7200
(901) 680-7201 facsimile
Cam.Hillyer@butlersnow.com
Michael.McLaren@butlersnow.com
*Attorneys for Banded Finance, LLC*

12

## REVOLVING PROMISSORY NOTE

$8,000,000.00

Memphis, Tennessee
June 11, 2008

FOR VALUE RECEIVED, the undersigned promise(s) to pay to the order of SunTrust Bank, a Georgia state chartered bank, having an office in Memphis, Tennessee ("Lender"), the principal sum of Eight Million and No/100 Dollars ($8,000,000.00) with interest on the disbursed and unpaid principal balance from the date of disbursement, until paid, at the rate of interest hereinafter specified.  Said interest shall be payable on the 5th day of each successive month following the calendar month for which such interest accrues commencing on July 5, 2008, with the final payment of interest being due and payable on the same date that the principal balance is due hereunder.  The principal amount owed hereunder, together with any accrued interest thereon, shall be due and payable on June 5, 2010.  All payments of principal and interest shall be payable in collected funds at One Commerce Square, 2nd Floor, Memphis, Tennessee 38150, or such other place as the holder hereof may designate in writing, in lawful money of the United States of America which shall be legal tender in payment of all debts and dues, public and private, at the time of payment.  All payments hereon shall be applied to principal, accrued interest and charges and expenses owing on or in connection with this Note, in such order as the holder hereof elects.

This Promissory Note shall constitute a revolving line-of-credit promissory note and the principal amount hereof may be paid and reborrowed hereunder by the undersigned from time to time up to the said principal amount pursuant to a Loan and Security Agreement between the undersigned and Lender dated June 11, 2008, ("Loan Agreement") subject to the repayment terms hereof and provided that there is no Event of Default hereunder nor any event which, with the giving of notice and lapse of time, or both, would constitute an Event of Default hereunder.  $1,000,000.00 of this Note consists of an overline facility ("Overline Facility") which shall only be available from even date through September 30, 2008; from March 1, 2009 through September 30, 2009 and from March 1, 2010 through June 5, 2010 ("Overline Period").  The Overline Facility shall be repaid in full at the end of each Overline Period.

Subject to the limitations hereinafter set forth, the disbursed and unpaid principal balance of the indebtedness evidenced hereby shall bear interest at a rate per annum which shall be equal to the following:

a.     A variable rate per annum ("Variable Rate") based on a three hundred and sixty (360) day year which shall be equal to the lesser of (i) the maximum rate of interest ("Maximum Rate") which Lender may lawfully charge, or (ii) a rate which is 150 basis points per annum higher than the LIBOR Rate (as hereinafter defined), adjusted and determined as of the opening of business on June 11, 2008 (the "Initial Pricing Date") and on the 1st day of each calendar month thereafter (each the "Interest Rate Change Date").  The LIBOR Rate shall mean the London InterBank Offered Rate of interest for an interest period of one (1) month, as reported in The Wall Street Journal published on the Interest Rate Change Date of each month.  Each change in the Variable Rate which results from a change in the LIBOR Rate shall become effective, without notice to the undersigned, on each Interest Rate Change Date following any change in the LIBOR Rate; provided, however, that if The Wall Street Journal is not published on such date, the LIBOR Rate shall be determined by reference to The Wall Street Journal last published immediately preceding such date.  In the event that at any time prior to maturity the rate of interest specified in clause (ii) above (determined as of the dates when changes become effective above) shall exceed the Maximum Rate, Lender may, at its option and without notice to the undersigned, charge interest at the Maximum Rate for the period of time during which said rate of interest specified in clause (ii) above exceeds the Maximum Rate and all unpaid interest then accrued at said Maximum Rate shall be due and payable ten (10) days following the date upon which Lender notifies the undersigned of the amount of such accrued but unpaid interest.

b.     Notwithstanding any other provisions herein, if any Change in Law (as hereinafter defined) shall make it unlawful for the Lender to make or maintain a LIBOR Rate loan as contemplated by this Note, the principal outstanding hereunder shall, if required by law and if the Lender so requests, be converted on the date required to make the loan evidenced by this Note legal to a loan accruing interest at the lesser of the Maximum Rate or the Prime rate of interest ("Prime Rate") established from time to time by the Lender.  Each change in the

_____ Initials

**EXHIBIT A**

Prime Rate shall become effective, without notice to the undersigned, on the same date that the Prime Rate changes. The undersigned hereby agrees promptly to pay the Lender, upon demand, any costs incurred by the Lender in making any conversion in accordance with this paragraph, including any interest or fees payable by the Lender to lenders of funds obtained by it in order to maintain its LIBOR Rate loans. The undersigned acknowledges that the Prime Rate is one of several interest rate indices employed by the Lender and that the Lender has made, and may hereafter make, loans bearing interest at rates which are higher or lower than the Prime Rate.

      c.     The undersigned further agrees to enter into a modification of this Note, at the request of the Lender, to bring this Note into compliance with any Change in Law. "Change in Law" shall mean the adoption of any law, rule, regulation, policy, guideline or directive (whether or not having the force of law) or any change therein or in the interpretation or application thereof, in all cases by any Governmental Authority having jurisdiction over the Lender, in each case after the date hereof. "Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof and any entity exercising regulatory functions of or pertaining to government.

      The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder:

      (a)     If the undersigned shall fail to pay any installment or payment of principal or interest when due, as specified above;

      (b)     If the undersigned shall otherwise default hereunder; or

      (c)     Upon the occurrence of any default and lapse of any applicable notice and/or cure rights under the terms and provisions of the Loan Agreement securing this Note hereinafter specified or any other mortgage, deed of trust, security agreement, assignment of rents, or other instrument executed by the undersigned in connection with the indebtedness evidenced hereby, or upon the occurrence of any default and lapse of any applicable notice and/or cure rights under the terms and provisions of any loan agreement between the undersigned and Lender relating to the indebtedness evidenced hereby.

      Said events specified in subparagraphs (a) or (b) above shall not constitute an Event of Default unless (i) with regard to subparagraph (a) above or any other monetary default or failure to pay any amount of money when due, such event, default or failure continues for a period of five (5) days after written notice to the undersigned pursuant to the Loan Agreement hereinafter specified, and (ii) with regard to any other event stated in subparagraph (b) above for which no time limit is specified, such event continues for a period of fifteen (15) days after written notice to the undersigned pursuant to the Loan Agreement. Said notice provisions and any other notice provisions contained in any other document shall run concurrently and not successively and no notice shall be required, and an Event of Default shall immediately occur, in the event any of said events occur after three (3) or more notices are given pursuant to subparagraphs (i) or (ii) of this paragraph during any twelve (12) month period.

      Should any Event of Default occur, the unpaid principal balance and all accrued interest owed under this Note shall, at the option of Lender, immediately become due and payable without presentment, demand, protest, or notice of any kind, all of which the undersigned waives, and Lender shall have the rights and privileges provided hereunder or under any other document executed with respect to any collateral security for this Note. In the event of the occurrence of any Event of Default, and if Lender exercises its option to require the indebtedness hereunder to be immediately paid, then in such event and from the date of the occurrence of such Event of Default, the principal balance of the indebtedness hereunder, notwithstanding any other provisions herein to the contrary, shall bear interest at a rate equal to the highest rate allowed by applicable law. The undersigned shall pay the holder hereof, upon demand, all expenses and costs, including, but not being limited to, reasonable attorneys' fees, that the holder hereof incurs (i) in collecting or attempting to collect the indebtedness evidenced by this Promissory Note, (ii) in enforcing the Loan Agreement or any deed of trust, mortgage, assignment of rents and leases, security agreement or other collateral that secures this Promissory Note or any guaranty thereof (herein together "Security Documents"), (iii) in protecting the collateral encumbered by the Security Documents, (iv) in defending or asserting the holder's rights in said collateral, and/or (v) with regard to any bankruptcy, reorganization or insolvency proceeding involving this Promissory Note, the Security Documents or said collateral.

      _____ Initials

EXHIBIT A

The undersigned shall pay to the payee hereof a late charge of the lesser of (i) five percent (5%) of any monthly payment hereunder which is not received by the payee hereof within fifteen (15) days of when said payment is due hereunder or (ii) any lesser maximum amount permitted under applicable law. No late charge, however, shall be imposed on any payment made on time and in full solely by reason of any previously accrued and unpaid late charge. The parties agree that said late charge represents a reasonable sum considering all of the circumstances existing on the date of this Note and represents a fair and reasonable estimate of the costs that the Lender will incur by reason of the late payment. The parties further agree that proof of actual damages would be difficult. Acceptance of any late charge shall not constitute a waiver of any default with respect to any overdue payment and shall not prevent the Lender from exercising any other rights and remedies available to the Lender.

This Promissory Note and any and all terms and provisions hereof, including, but not limited to, those pertaining to the amount, maturity date, and manner of payment of the principal hereof and the interest hereon, may be modified and amended at any time by mutual written agreement of, and only by mutual written agreement of, the undersigned and the holder hereof.

The failure of the holder hereof to exercise any option to accelerate the indebtedness evidenced hereby in the event of the occurrence of an Event of Default as above provided or any forbearance, indulgence, or other delay by such holder in the exercise of any such option, shall not constitute a waiver of the right to exercise such option prior to the curing of any such Event of Default or in the event of any subsequent Event of Default, whether similar or dissimilar to any prior default.

The undersigned may pay the principal amount outstanding hereunder, or any portion thereof, together with all accrued interest hereunder, at any time without penalty.

Presentment for payment, demand, protest, notice of protest, notice of nonpayment, notice of dishonor and any and all other notices and demands whatsoever are hereby waived by all makers, sureties, guarantors and endorsers hereof, each of whom agree to remain bound until the principal and interest on this Note are paid in full. This Note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers hereof, and shall be binding upon them and their heirs, personal representatives, successors and assigns.

To the extent permitted by applicable law, Lender reserves a right of setoff in all of the undersigned's accounts with Lender (whether checking, savings, or some other account). This includes all accounts the undersigned may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. The undersigned authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness evidenced hereby against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

It is the intention of Lender and the undersigned to comply strictly with all applicable usury laws; and, accordingly, in no event and upon no contingency shall Lender ever be entitled to receive, collect or apply as interest any interest, fees, charges or other payments equivalent to interest, in excess of the maximum rate which Lender may lawfully charge under applicable statutes and laws from time to time in effect ("Maximum Rate"). In determining whether or not the interest paid or payable, under any specific contingency, exceeds the highest contract rate permitted by applicable law from time to time in effect, the undersigned hereof and Lender shall, to the maximum extent permitted under applicable law, characterize the non-principal payment as a reasonable loan charge, rather than as interest. Any provision hereof, or of any other agreement between Lender and the undersigned, that operates to bind, obligate or compel the undersigned to pay interest in excess of such maximum lawful contract rate shall be construed to require the payment of the maximum rate only. The provisions of this paragraph shall be given precedence over any other provision contained herein or in any other agreement between Lender and the undersigned that is in conflict with the provisions of this paragraph.

This Note shall be governed and construed according to the statutes and laws of the State of Tennessee from time to time in effect, except to the extent that applicable federal statutes may permit the charging of a higher rate of interest than applicable state law, in which event such applicable federal statute, as amended and supplemented from time to time, shall govern and control the maximum rate of interest permitted to be charged

3

_____ Initials

EXHIBIT A

hereunder, it being intended that, as to the maximum rate of interest which may be charged, received and collected hereunder, those applicable statutes and laws, whether state or federal, from time to time in effect, which permit the charging of a higher rate of interest, shall govern and control; provided, always, however, that in no event and under no circumstances shall the undersigned be liable for the payment of interest in excess of the maximum rate permitted by such applicable law, from time to time in effect.

AVERY OUTDOORS, INC.
a Tennessee corporation

By:

Name:

Title:

Address:

6925807.1

4

**EXHIBIT A**

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (this "<u>Agreement</u>") dated as of the Effective Date between SunTrust Bank, a Georgia state chartered bank ("<u>Bank</u>"), and Avery Outdoors, Inc., a Tennessee corporation ("<u>Borrower</u>"), provides the terms on which Bank shall lend to Borrower and Borrower shall repay Bank. The parties agree as follows:

1.    <u>Accounting and Other Terms</u>.  Accounting terms not defined in this Agreement shall be construed following GAAP.   Calculations and determinations must be made following GAAP. Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in <u>Section 13</u>.  All other terms contained in this Agreement, unless otherwise indicated, shall have the meaning provided by the Code to the extent such terms are defined therein.

2.    <u>Loan and Terms of Payment</u>.

2.1    <u>Promise to Pay</u>.  Borrower hereby unconditionally promises to pay Bank the outstanding principal amount of all Credit Extensions and accrued and unpaid interest thereon as and when due in accordance with this Agreement.

2.1.1    <u>Revolving Advances</u>.

(a)    <u>Availability</u>.   Subject to the terms and conditions of this Agreement, Bank shall make Advances not exceeding the Availability Amount.   Amounts borrowed under the Revolving Line may be repaid and, prior to the Revolving Line Maturity Date, reborrowed, subject to the applicable terms and conditions precedent herein.   The Revolving Line shall be evidenced by the Revolving Promissory Note.

(b)    <u>Overline Facility</u>.  Within the Revolving Line there shall be provided an Overline Facility during the seasonal Overline Period.  The Overline Facility must be repaid by the end of each Overline Period.

(c)    <u>Termination; Repayment</u>.  The Revolving Line terminates on the Revolving Line Maturity Date, when the principal amount of all Advances, the unpaid interest thereon, and all other Obligations relating to the Revolving Line shall be immediately due and payable.

2.1.2    <u>Term Advances</u>.

(a)    <u>Availability</u>.   Subject to the terms and conditions of this Agreement, Bank shall make an advance at Closing in the amount of the Term Promissory Note.

(b)    <u>Termination; Repayment</u>.  The Term Promissory Note is payable in sixty (60) monthly installments of principal and interest and matures on June 5, 2013.

2.2    <u>Overadvances</u>.  If, at any time, the Credit Extensions under <u>Section 2.1.1</u> exceed the lesser of either (a) the Revolving Line or (b) the Borrowing Base, Borrower shall immediately pay to Bank in cash such excess.

2.3    <u>Fees</u>.  Borrower shall pay to Bank:

1

**EXHIBIT A**

(a)   Commitment Fee. [Intentionally Omitted]

(b)   Bank Expenses.  All Bank Expenses (including reasonable attorneys' fees and expenses, for documentation and negotiation of this Agreement) incurred through and after the Effective Date, when due.

3.   Conditions of Loans

3.1   Conditions Precedent to Initial Credit Extension. Bank's obligation to make the initial Credit Extension is subject to the condition precedent that Bank shall have received, in form and substance satisfactory to Bank, such documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate, including, without limitation:

(a)   Borrower shall have delivered duly executed original signatures to the Loan Documents to which it is a party;

(b)   Borrower shall have delivered its Operating Documents and good standing certificates of Borrower certified by the Secretary of State of the State of Tennessee, each as of the date no earlier than thirty (30) days prior to the Effective Date;

(c)   Borrower shall have delivered duly executed original signatures to the completed Borrowing Certificate for Borrower;

(d)   Bank shall have received certified copies, dated as of a recent date, of financing statement searches, as Bank shall request, accompanied by written evidence (including any UCC termination statements) that the Liens indicated in any such financing statements either constitute Permitted Liens or have been or, in connection with the initial Credit Extension, will be terminated or released;

(e)   Borrower shall have delivered the Perfection Certificate executed by Borrower;

(f)   Borrower shall have delivered evidence satisfactory to Bank that the insurance policies required by Section 6.4 hereof are in full force and effect, together with appropriate evidence showing loss payable and/or additional insured clauses or endorsements in favor of Bank;

(g)   Borrower shall have paid the fees and Bank Expenses then due as specified in Section 2.4 hereof;

(h)   Bank shall have received the Guaranties executed by the Guarantors; and

(i)   Bank shall have performed at no cost to Borrower account receivable and inventory audit acceptable to Bank.

3.2   Conditions Precedent to all Credit Extensions. Bank's obligations to make each Credit Extension, including the initial Credit Extension, is subject to the following:

2

**EXHIBIT A**

(a)     the representations and warranties in <u>Section 5</u> shall be true in all material respects on the Funding Date of each Credit Extension; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date, accurate and complete in all material respects as of such date, and no Default or Event of Default shall have occurred and be continuing or result the Credit Extension. Each Credit Extension is Borrower's representation and warranty on that date that the representations and warranties in <u>Section 5</u> remain true in all material respects; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date; and

(b)     in Bank's sole discretion, there has not been a Material Adverse Change.

3.3     <u>Covenant to Deliver</u>.  Borrower agrees to deliver to Bank each item required to be delivered to Bank under this Agreement as a condition to any Credit Extension.  Borrower expressly agrees that the extension of a Credit Extension prior to the receipt by Bank of any such item shall not constitute a waiver by Bank of Borrower's obligation to deliver such item, and any such extension in the absence of a required item shall be in Bank's sole discretion.

3.4     <u>Procedures for Borrowing</u>.

(a)     <u>Advances</u>.  Borrower has entered into a Sweep Agreement for the Designated Deposit Account.  Subject to the prior satisfaction of all other applicable conditions to the making of an Advance set forth in this Agreement, to obtain an Advance, Borrower shall either write checks drawn on the Designated Deposit Account or notify Bank (which notice shall be irrevocable) by electronic mail, facsimile, or telephone by 3:00 p.m. Central time on the Funding Date of the Advance.  Bank may rely on any telephone notice given by a person whom Bank believes is a Responsible Officer or designee.  Bank shall credit Advances to the Designated Deposit Account.  Bank may make Advance under this Agreement based on instructions from a Responsible Officer or his or her designee or without instructions if the Advances are necessary to meet Obligations which have become due.

4.     <u>Creation of Security Interest</u>.

4.1     <u>Grant of Security Interest</u>.  Borrower hereby grants Bank, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to Bank, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  Borrower represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only to Permitted Liens that may have superior priority to Bank's Lien under this Agreement).  If Borrower shall acquire a commercial tort claim, Borrower shall promptly notify Bank in a writing signed by Borrower of the general details thereof and grant to Bank in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Bank.

If this Agreement is terminated, Bank's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations) are repaid in full in cash.  Upon payment in full in cash of the Obligations and at such time as Bank's obligation to make Credit Extensions has terminated, Bank shall,

3

EXHIBIT A

at Borrower's sole cost and expense, release its Liens in the Collateral and all rights therein shall revert to Borrower.

        4.2   <u>Authorization to File Financing Statements</u>.  Borrower hereby authorizes Bank to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Bank's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Bank under the Code.

      5.   <u>Representations and Warranties</u>.  Borrower represents and warrants as follows:

        5.1   <u>Due Organization and Authorization</u>.  Borrower and each of its Subsidiaries are duly existing and in good standing in their respective jurisdictions of formation and are qualified and licensed to do business and are in good standing in any jurisdiction in which the conduct of their business or their ownership of property requires that they be qualified except where the failure to do so could not reasonably be expected to have a material adverse effect on Borrower's business.  In connection with this Agreement, Borrower has delivered to Bank a completed certificate substantially in the form attached hereto as <u>Exhibit G</u> signed by Borrower, entitled "Perfection Certificate".  Borrower represents and warrants to Bank that (a) Borrower's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof; (b) Borrower is an organization of the type and is organized in the jurisdiction set forth in the Perfection Certificate; (c) the Perfection Certificate accurately sets forth Borrower's organizational identification number or accurately states that Borrower has none; (d) the Perfection Certificate accurately sets forth Borrower's place of business, or, if more than one, its chief executive office as well as Borrower's mailing address (if different than its chief executive office); (e) Borrower (and each of its predecessors) has not, in the past five (5) years, changed its jurisdiction; and (f) all other information set forth on the Perfection Certificate pertaining to Borrower and each of its Subsidiaries is accurate and complete.

      The execution, delivery and performance of the Loan Documents have been duly authorized, and do not conflict with Borrower's organizational documents, nor constitute an event of default under any material agreement by which Borrower is bound.  Borrower is not in default under any agreement to which it is a party or by which it is bound in which the default could reasonably be expected to have a material adverse effect on Borrower's business.

        5.2   <u>Collateral</u>.  Borrower has good title to, has rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder, free and clear of any and all Liens except Permitted Liens.  Borrower has no deposit accounts other than the deposit accounts with Bank, the deposit accounts, if any, described in the Perfection Certificate delivered to Bank in connection herewith, or of which Borrower has given Bank notice and taken such actions as are necessary to give Bank a perfected security interest therein.  The Accounts are bona fide, existing obligations of the Account Debtors.

      The Collateral is not in the possession of any third party bailee (such as a warehouse) except as otherwise provided in the Perfection Certificate.  None of the components of the Collateral shall be maintained at locations other than as provided in the Perfection Certificate or as Borrower has given Bank notice pursuant to <u>Section 7.2</u>.  In the event that Borrower, after the date hereof, intends to store or otherwise deliver any portion of the Collateral to a bailee, then Borrower will first receive the written consent of Bank and such bailee must execute and deliver a bailee agreement in form and substance satisfactory to Bank in its sole discretion.

      Borrower is the sole owner of its Intellectual Property, except for non-exclusive licenses granted to its customers in the ordinary course of business.  Each patent is valid and enforceable, and no part of

4

EXHIBIT A

the Intellectual Property has been judged invalid or unenforceable, in whole or in part, and to the best of Borrower's knowledge, no claim has been made that any party of the Intellectual Property violates the rights of any third party except to the extent such claim could not reasonably be expected to have a material adverse effect on Borrower's business.  Except as noted on the Perfection Certificate, Borrower is not a party to, nor is bound by, any material license or other agreement with respect to which Borrower is the licensee that prohibits or otherwise restricts Borrower from granting a security interest in Borrower's interest in such license or agreement or any other property.  Borrower shall provide written notice to Bank within ten (10) days of entering or becoming bound by any such license or agreement which is reasonably likely to have a material impact on Borrower's business or financial condition (other than over-the-counter software that is commercially available to the public).  Borrower shall take such steps as Bank requests to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for all such licenses or contract rights to be deemed "Collateral" and for Bank to have a security interest in it that might otherwise be restricted or prohibited by law or by the terms of any such license or agreement (such consent or authorization may include a licensor's agreement to a contingent assignment of the license to Bank if Bank determines that is necessary in its good faith judgment), whether now existing or entered into in the future.

       5.3    Accounts Receivable.  For any Eligible Account in any Borrowing Base Certificate, all statements made and all unpaid balances appearing in all invoices, instruments and other documents evidencing such Eligible Accounts are and shall be true and correct and all such invoices, instruments and other documents, and all of Borrower's Books are genuine and in all respects what they purport to be.  All sales and other transactions underlying or giving rise to each Eligible Account shall comply in all material respects with all applicable laws and governmental rules and regulations. Borrower has no knowledge of any actual or imminent Insolvency Proceeding of any Account Debtor whose accounts are an Eligible Account in any Borrowing Base Certificate.  To the best of Borrower's knowledge, all signature and endorsements on all documents, instruments, and agreements relating to all Eligible Accounts are genuine, and all such documents, instruments, and agreements are legally enforceable in accordance with their terms.

       5.4    Litigation.  There are no actions or proceedings pending or, to the knowledge of the Responsible Officers, threatened in writing by or against Borrower or any of its Subsidiaries involving more than $100,000, except as set forth in the Perfection Certificate.

       5.5    No Material Deviation in Financial Statements.  All consolidated financial statements for Borrower and any of its Subsidiaries delivered to Bank fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated financial results of operations. There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Bank.

       5.6    Solvency.  The fair salable value of Borrower's assets (including goodwill minus disposition costs) exceeds the fair value of its liabilities; Borrower is not left with unreasonably small capital after the transactions in this Agreement; and Borrower is able to pay its debts (including trade debts) as they mature.

       5.7    Regulatory Compliance.  Borrower is not an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act.  Borrower is not engaged as one of its important activities in extending credit for margin stock (under Regulations T and U of the Federal Reserve Board of Governors).  Borrower has complied in all material respects with the Federal Fair Labor Standards Act.  Borrower has not violated any laws, ordinances or rules, the violation of which could reasonably be expected to have material adverse effect on its business.  None of Borrower's or any of its Subsidiaries' properties or assets has been used by Borrower or any Subsidiary

5

EXHIBIT A

or, to the best of Borrower's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than legally. Borrower and each of its Subsidiaries have obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all government authorities that are necessary to continue its business as currently conducted.

      5.8    Subsidiaries; Investments. Borrower does not own any stock, partnership interest or other equity securities except for Permitted Investments.

      5.9    Tax Returns and Payments; Pension Contributions. Borrower has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower. Borrower may defer payment of any contested taxes, provided that Borrower (a) in good faith contests its obligation to pay the taxes by appropriate proceedings promptly and diligently instituted and conducted, (b) notifies Bank in writing of the commencement of, and any material development in, the proceedings, (c) posts bonds or takes any other steps required to prevent the governmental authority levying such contested taxes from obtaining a Lien upon any of the Collateral that is other than a "Permitted Lien". Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years which could result in additional taxes becoming due and payable by Borrower. Borrower has paid all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and Borrower has not withdrawn from participation in, and has not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

      5.10    Use of Proceeds. Borrower shall use the proceeds of the Credit Extensions solely as working capital, to finance trade accounts receivable and inventory, and to fund its general business requirements and not for personal, family, household or agricultural purposes.

      5.11    Full Disclosure. No written representation, warranty or other statement of Borrower in any certificate or written statement given to Bank, as of the date such representations, warranties, or other statements were made, taken together with all such written certificates and written statement given to Bank, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statement contained in the certificates or statements not misleading (it being recognized by Bank that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

      6.    Affirmative Covenants. Borrower shall do all of the following:

      6.1    Government Compliance. Maintain its and all its Subsidiaries' legal existence and good standing in their respective jurisdiction of formation and maintain qualification in each jurisdiction in which the failure to so qualify would reasonably be expected to have a material adverse effect on Borrower's business or operations. Borrower shall comply, and have each Subsidiary comply, with all laws, ordinances and regulations to which it is subject, noncompliance with which could have a material adverse effect on Borrower's business.

      6.2    Financial Statements, Reports, Certificates.

          (a)    Deliver to Bank: (i) as soon as available, but no later than one hundred twenty (120) days after the last day of Borrower's fiscal year, audited consolidated financial statements prepared under GAAP, consistently applied, together with an unqualified opinion on

6

**EXHIBIT A**

the financial statements from an independent certified public accounting firm acceptable to Bank in its reasonable discretion.

(b)     Within fifteen (15) days after the last day of each month, deliver to Bank a duly completed Borrowing Base Certificate signed by a Responsible Officer, with aged listings of accounts receivable and accounts payable (by invoice date).

(c)     Within one hundred twenty (120) days after the last day of Borrower's fiscal year, deliver to Bank with the monthly financial statements, a duly completed Compliance Certificate signed by a Responsible Officer setting forth calculations showing compliance with the financial covenants set forth in this Agreement.

(d)     Permit Bank to perform at no cost to Borrower an annual account receivable and inventory audit.

6.3     Taxes; Pensions.  Make, and cause each of its Subsidiaries to make, timely payment of all foreign, federal, state, and local taxes or assessments (other than taxes and assessments which Borrower is contesting pursuant to the terms of Section 5.9 hereof) and shall deliver to Bank, on demand, appropriate certificates attesting to such payments, and pay all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms.

6.4     Insurance.  Keep is business and the Collateral insured for risks and in amounts standard for companies in Borrower's industry and location and as Bank may reasonably request. Insurance policies shall be in a form, with companies, and in amounts that are satisfactory to Bank.  All property policies shall have a lender's loss payable endorsement showing Bank as the sole lender loss payee and waive subrogation against Bank, and all liability policies shall show, or have endorsements showing Bank as an additional insured.  All policies (or the loss payable and additional insured endorsements) shall provide that the insurer must give Bank at least twenty (20) days notice before canceling, amending, or declining to renew its policy.  At Bank's request, Borrower shall deliver certified copies of policies and evidence of all premium payments.  Except as otherwise provided in Section 2.1.3(c), proceeds payable under any policy shall, at Bank's option, be payable to Bank on account of the Obligations.  Notwithstanding the foregoing, (a) so long as no Event of Default has occurred and is continuing, Borrower shall have the option of applying the proceeds of any casualty policy up to $50,000, in the aggregate, toward the replacement or repair of destroyed or damaged property; provided that any such replaced or repaired property (i) shall be of equal or like value as the replaced or repaired Collateral and (ii) shall be deemed Collateral in which Bank has been granted a first priority security interest, and (b) after the occurrence and during the continuance of an Event of Default, all proceeds payable under such casualty policy shall, at the option of Bank, be payable to Bank on account of the Obligations.  If Borrower fails to obtain insurance as required under this Section 6.4 or to pay any amount or furnish any required proof of payment to third persons and Bank, Bank may make all or part of such payment or obtain such insurance policies required in this Section 6.4, and take any action under the policies Bank deems prudent.

6.5     Operating Accounts.

(a)     Maintain its and its Subsidiaries' primary depository accounts and all of its operating accounts and securities accounts with Bank and Bank's affiliates; provided, however that Borrower may maintain deposit accounts at financial institutions other than Bank with balances not exceeding $10,000 in the aggregate at any time outstanding.

7

EXHIBIT A

(b)    In addition, for each Collateral Account that Borrower at any time maintains, Borrower shall cause the applicable bank or financial institution (other than Bank) at or with which any Collateral Account is maintained to execute and deliver a Control Agreement or other appropriate instrument with respect to such Collateral Account to perfect Bank's Lien in such Collateral Account in accordance with the terms hereunder.  The provisions of the previous sentence shall not apply to deposit accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's employees and identified to Bank by Borrower as such.

6.6    <u>Financial Covenants</u>.  Borrower shall maintain at all times, to be tested as of the last day of each fiscal year, unless otherwise noted, on a consolidated basis with respect to Borrower and its Subsidiaries:

(a)    <u>Total Liabilities to Tangible Net Worth Ratio</u>.  A ratio of Total Liabilities to Tangible Net worth of not more than 2.50 to 1.00:

6.7    <u>Protection and Registration of Intellectual Property Rights</u>.  Borrower shall: (a) protect, defend and maintain the validity and enforceability of its Intellectual Property; (b) promptly advise Bank in writing of material infringements of its Intellectual Property; and (c) not allow any Intellectual Property material to Borrower's business to be abandoned, forfeited or dedicated to the public without Bank's written consent.  If Borrower decides to register any copyrights or mask works in the United States Copyright Office, Borrower shall:  (x) provide Bank with at least fifteen (15) days prior written notice of its intent to register such copyrights or mask works together with a copy of the application it intends to file with the United States Copyright Office (excluding exhibits thereto); (y) execute an Intellectual Property security agreement or such other documents as Bank may reasonably request to maintain the perfection and priority of Bank's security interest in the copyrights or mask works intended to be registered with the United States Copyright Office; and (z) record such Intellectual Property security agreement with the United States Copyright Office contemporaneously with filing the copyright or mask work application(s) with the United States Copyright Office.  Borrower shall promptly provide to Bank a copy of the application(s) filed with the United States Copyright Office together with evidence of the recording of the Intellectual Property security agreement necessary for Bank to maintain the perfection and priority of its security interest in such copyrights or mask works.  Borrower shall provide written notice to Bank of any application filed by Borrower in the United States Patent and Trademark Office for a patent or to register a trademark or service mark within 30 days after any such filing.

6.8    <u>Litigation Cooperation</u>.  From the date hereof and continuing through the termination of this Agreement, make available to Bank, without expense to Bank, Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Bank may deem them reasonably necessary to prosecute or defend any third-party suit or proceeding instituted by or against Bank with respect to any Collateral or relating to Borrower.

6.9    <u>Further Assurances</u>.  Borrower shall execute any further instruments and take further action as Bank reasonable requests to perfect or continue Bank's Lien in the Collateral or to effect the purposes of this Agreement, including semi annual field audits.

7.    <u>Negative Covenants</u>.  Borrower shall not do any of the following without Bank's written consent:

7.1    <u>Dispositions</u>.  Convey, sell, lease, transfer or otherwise dispose of (collectively, "<u>Transfer</u>"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, except

EXHIBIT A

for Transfers (a) of Inventory in the ordinary course of business; (b) of worn-out or obsolete Equipment; and (c) in connection with Permitted Liens and Permitted Investments.

7.2     <u>Changes in Business, Management, Ownership, or Business Locations</u>.   (a) Engage in or permit any of its Subsidiaries to engage in any business other than the businesses currently engaged in by Borrower and such Subsidiary, as applicable, or reasonably related thereto; (b) liquidate or dissolve; or (c) (i) have a change in management or (ii) enter into any transaction or series of related transactions in which the Guarantors own less than 51% of the voting stock of Borrower immediately after giving effect to such transaction or related series of such transactions (other than by the sale of Borrower's equity securities in a public offering or to venture capital investors so long as Borrower identifies to Bank the venture capital investors prior to the closing of the transaction). Borrower shall not, without at least thirty (30) days prior written notice to Bank:  (1) add any new offices or business locations, including warehouses (unless such new offices or business locations contain less than Ten Thousand Dollars ($10,000) in Borrower's assets or property), (2) change its jurisdiction of organization, (3) change its organizational structure or type, (4) change its legal name, or (5) change any organizational number (if any) assigned by its jurisdiction of organization.

7.3     <u>Mergers or Acquisitions</u>.   Merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with any other Person, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person.  A Subsidiary may merge or consolidate into another Subsidiary or into Borrower.

7.4     <u>Indebtedness</u>.   Create, incur, assume, or be liable for any Indebtedness, or permit any Subsidiary to do so, other than Permitted Indebtedness.

7.5     <u>Encumbrance</u>.   Create, incur, or allow any Lien on any of its property, assign or convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries to do so, except for Permitted Liens, permit any Collateral not to be subject to the first priority security interest granted herein, or enter into any agreement, document, instrument or other arrangement (except with or in favor of Bank) with any Person which directly or indirectly prohibits or has the effect of prohibiting Borrower or any Subsidiary from assigning, mortgaging, pledging, granting a security interest in or upon, or encumbering any of Borrower's or any Subsidiary's Intellectual Property, except as is otherwise permitted in <u>Section 7.1</u> hereof and the definition of "Permitted Lien" herein.

7.6     <u>Maintenance of Collateral Accounts</u>.   Maintain any Collateral Account except pursuant to the terms of <u>Section 6.5(b)</u> hereof.

7.7     <u>Distributions; Investments</u>.   Directly or indirectly make any Investment other than Permitted Investments, or permit any of its Subsidiaries to do so.

7.8     <u>Transactions with Affiliates</u>.   Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower, except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

7.9     <u>Subordinated Debt</u>.   (a) Make or permit any payment on any Subordinated Debt, except under the terms of the subordination, intercreditor, or other similar agreement to which such Subordinated Debt is subject, or (b) amend any provision in any document relating to the Subordinated Debt which would increase the amount thereof or adversely affect the subordination thereof to Obligations owed to Bank.

9

EXHIBIT A

7.10    Compliance.  Become an "investment company" or a company controlled by an "investment company", under the Investment Company Act of 1940 or undertake as one of its important activities extending credit to purchase or carry margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System), or use the proceeds of any Credit Extension for that purpose; fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur; fail to comply with the Federal Fair Labor Standards Act or violate any other law or regulations, if the violation could reasonably be expected to have material adverse effect on Borrower's business, or permit the occurrence of any other event with respect to, any present pension, profit sharing and deferred compensation plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

8.    Events of Default.  Any one of the following shall constitute an event of default (an "Event of Default") under this Agreement:

8.1    Payment Default.  Borrower fails to make any payment of principal or interest on the Revolving Promissory Note, or pay any other Obligations within five (5) Business Days after such Obligations are due and payable.  During the cure period, the failure to cure the payment default is not an Event of Default (but no Credit Extension will be made during the cure period);

8.2    Covenant Default.

(a)    Borrower fails or neglects to perform any obligation in Sections 6.2, 6.6, or 6.7, or violates any covenant in Section 7; or

(b)    Borrower fails or neglects to perform, keep, or observe any other term, provision, condition, covenant or agreement contained in this Agreement, any Loan Documents, and as to any default (other than those specified in this Section 8) under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure the default within fifteen (15) days after the occurrence thereof.  No Credit Extensions shall be made during such cure period).  Grace periods provided under this section shall not apply, among other things, to financial covenants or any other covenants set forth in subsection (a) above;

8.3    Material Adverse Change.  A Material Adverse Change occurs;

8.4    Attachment.  (a) Any material portion of Borrower's assets is attached, seized, levied on, or comes into possession of a trustee or receiver and the attachment, seizure or levy is not removed in ten (10) days; (b) the service of process upon Bank seeking to attach, by trustee or similar process, any funds of Borrower or of any entity under control of borrower (including a Subsidiary) on deposit with Bank; (c) Borrower is enjoined, restrained, or prevented by court order from conducting a material part of its business; (d) a judgment or other claim in excess of $100,000 becomes a Lien on any of Borrower's assets; or (e) a notice of lien, levy, or assessment is filed against any of Borrower's assets by any government agency and not paid within ten (10) days after Borrower receives notice.  These are not Events of Default if stayed or if a bond is posted pending contest by Borrower (but no Credit Extensions shall be made during the cure period);

8.5    Insolvency.  Borrower is unable to pay its debts (including trade debts) as they become due or otherwise becomes insolvent; (b) Borrower begins an Insolvency Proceeding; or (c) an Insolvency Proceeding is begun against Borrower and not dismissed or stayed within thirty (30) days (but no Credit Extensions shall be made while any of the conditions described in clause (a) exist and/or until any Insolvency Proceeding is dismissed);

EXHIBIT A

8.6     Other Agreements.  There is a default in any agreement to which Borrower or any Guarantor is a party with a third party or parties resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of Fifty Thousand Dollars ($50,000) or that could have a material adverse effect on Borrower's or any Guarantor's business;

8.7     Judgments.  A judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least Fifty Thousand Dollars ($50,000) (not covered by independent third-party insurance shall be rendered against Borrower and shall remain unsatisfied and unstayed for a period of ten (10) days after entry thereof (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

8.8     Misrepresentations.  Borrower or any Person acting for Borrower makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Bank or to induce Bank to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is incorrect in any material respect when made;

8.9     Subordinated Debt.  A default or breach occurs under any agreement between Borrower and any creditor or Borrower that signed a subordination, intercreditor, or other similar agreement with Bank, or any creditor that has signed such an agreement with Bank breaches any terms of such agreement; or

9.     **Bank's Rights and Remedies.**

9.1     Rights and Remedies.  While an Event of Default occurs and continues Bank may, without notice or demand, do any or all of the following:

(a)     declare all Obligations immediately due and payable (but if an Event of Default described in Section 8.5 occurs all Obligations are immediately due and payable without any action by Bank);

(b)     stop advancing money or extending credit for Borrower's benefit under this Agreement or under any other agreement between Borrower and Bank;

(c)     settle or adjust disputes and claims directly with Account Debtors for amounts on terms and in any order that Bank considers advisable, notify any Person owing Borrower money of Bank's security interest in such funds, and verify the amount of such account;

(d)     make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral.  Borrower shall assemble the Collateral if Bank requests and make it available as Bank designates.  Bank may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to its security interests and pay all expenses incurred.  Borrower grants Bank a license to enter and occupy any of its premises, without charge, to exercise any of Bank's rights or remedies;

(e)     apply to the Obligations any (i) balances and deposits of Borrower it holds, or (ii) any amount held by Bank owing to or for the credit or the account of Borrower;

(f)     ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral.  Bank is hereby granted a non-exclusive, royalty-free

11

**EXHIBIT A**

license or other right to use, without charge, Borrower's labels, patents, copyrights, mask works, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any collateral and, in connection with Bank's exercise of its rights under this Section, Borrower's rights under all licenses and all franchise agreements inure to Bank's benefit;

(g)     place a "hold" on any account maintained with Bank and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreements providing control of any Collateral;

(h)     demand and receive possession of Borrower's Books; and

(i)     exercise all rights and remedies available to Bank under the Loan Documents or at law or equity, including all remedies provided under the Code (including disposal of the Collateral pursuant to the terms thereof).

9.2     Power of Attorney.   Borrower hereby irrevocably appoints Bank as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to: (a) endorse Borrower's name on any checks or other forms of payment or security; (b) sign Borrower's name on any invoice or bill of lading for any Account or drafts against Account Debtors; (c) settle and adjust disputes and claims about the Accounts directly with accounts Debtors, for amounts and on terms Bank determines reasonable; (d) make, settle, and adjust all claims under Borrower's insurance policies; (e) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; and (f) transfer the Collateral into the name of Bank or a third party as the Code permits. Borrower hereby appoints Bank as its lawful attorney-in-fact to sign Borrower's name on any documents necessary to perfect or continue the perfection of any security interest regardless of whether an Event of Default has occurred until all Obligations have been satisfied in full and Bank is under no further obligation to make Credit Extensions hereunder.   Bank's foregoing appointment as Borrower's attorney-in-fact, and all of Bank's rights and powers, coupled with an interest, are irrevocable until all Obligations have been fully repaid and performed and Bank's obligation to provide Credit Extensions terminates.

9.3     Accounts Verification; Collection.   Whether or not an Event of Default has occurred and is continuing, Bank may notify any Person owing Borrower money of Bank's security interest in such funds and verify the amount of such account. After the occurrence of an Event of Default, any amounts received by Borrower shall be held in trust by Borrower for Bank, and, if requested by Bank, Borrower shall immediately deliver such receipts to Bank in the form received form the Account Debtor, with proper endorsements for deposit.

9.4     Protective Payments.   If Borrower fails to obtain the insurance called for by Section 6.5 or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document, Bank may obtain such insurance or make such payment, and all amounts so paid by Bank are Bank Expenses and immediately due and payable, bearing interest at the then highest applicable rate, and secured by the Collateral.   Bank will make reasonable efforts to provide Borrower with notice of Bank obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No payments by Bank are deemed an agreement to make similar payments in the future or Bank's waiver of any Event of Default.

9.5     Application of Payments and Proceeds.   Unless an Event of Default has occurred and is continuing, Bank shall apply any funds in its possession, whether from Borrower account balances,

12

EXHIBIT A

payments, or proceeds realized as the result of any collection of Accounts or other disposition of the Collateral, first, to Bank Expenses, including without limitation, the reasonable costs, expenses, liabilities, obligations and attorneys' fees incurred by Bank in the exercise of its rights under this Agreement; second, to the interest due upon any of the Obligations; and third, to the principal of the Obligations and any applicable fees and other charges, in such order as Bank shall determine in its sole discretion. Any surplus shall be paid to Borrower or other Persons legally entitled thereto; Borrower shall remain liable to Bank for any deficiency. If an Event of Default has occurred and is continuing, Bank may apply any funds in its possession, whether from Borrower account balances, payments, proceeds realized as the result of any collection of Accounts or other disposition of the Collateral, or otherwise, to the Obligations in such order as Bank shall determine in its sole discretion. Any surplus shall be paid to Borrower or other Persons legally entitled thereto; Borrower shall remain liable to Bank for any deficiency. If Bank, in its good faith business judgment, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Bank shall have the option, exercisable at any time, of either reducing the obligations by the principal amount of the purchase price or during the reduction of the Obligations until the actual receipt by Bank of cash therefore.

        9.6    <u>Bank's Liability for Collateral</u>.  So long as Bank complies with reasonable banking practices regarding the safekeeping of the Collateral in the possession or under the control of Bank, Bank shall not be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, or other Person. Borrower bears all risk of loss, damage or destruction of the Collateral.

        9.7    <u>No Waiver; Remedies Cumulative</u>.  Bank's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Bank thereafter to demand strict performance and compliance herewith or therewith. No waiver hereunder shall be effective unless signed by Bank and then is only effect for the specific instance and purpose for which it is given. Bank's rights and remedies under this Agreement and the other Loan Documents are cumulative. Bank has all rights and remedies provided under the Code, by law, or in equity. Bank's exercise of one right or remedy is not an election, and Bank's waiver of any Event of Default is not a continuing waiver. Bank's delay in exercising any remedy is not a waiver, election, or acquiescence.

        9.8    <u>Demand Waiver</u>.  Borrower waives demand, notice or default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Bank on which Borrower is liable.

      10.    <u>Notices</u>.  All notices, consents, requests, approvals, demands, or other communication (collectively, "<u>Communication</u>") by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or e-mail address indicated below. Bank or Borrower may change its address or facsimile number giving the other party written notice thereof in accordance with the terms of this <u>Section 10</u>.

13

# EXHIBIT A

| If to Borrower: | Avery Outdoors, Inc. |
|---|---|
| | _____ |
| | _____ |
| | Attn: _____ |
| | Fax: _____ |
| | E-mail: _____ |

| If to Bank: | SunTrust Bank |
|---|---|
| | One Commerce Square, 2nd Floor |
| | Memphis, TN 38150 |
| | Attn: Duncan Galbreath |
| | Fax: 901-523-4664 |
| | E-mail: duncan.galbreath@SunTrust.com |

11.    **Choice of Law, Venue and Jury Trial Waiver.**  Tennessee law governs the Loan Documents without regard to principles of conflicts of law.  Borrower and Bank each submit to the exclusive jurisdiction of the State and Federal courts in Shelby County, Tennessee; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Bank from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Bank.  Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court.  Borrower hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed Borrower at the address set forth in Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's actual receipt thereof or three (3) days after deposit in the U.S. mails, proper postage prepaid.

TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND BANK EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLIAM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS.  THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT.  EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

12.    **General Provisions.**

12.1    **Successors and Assigns.**  This Agreement binds and is for the benefit of the successors and permitted assigns of each party.  Borrower may not assign this Agreement or any rights or obligations under it without Bank's prior written consent (which may be granted or withheld in Bank's discretion).  Bank has the right, without the consent of or notice to Borrower, to sell, transfer, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights, and benefits under this Agreement and the other Loan Documents.

14

EXHIBIT A

12.2   Indemnification.  Borrower agrees to indemnify, defend and hold Bank and its directors, officers, employees, agents, attorneys, or any other person affiliated with or representing Bank harmless against:  (a) all obligations, demands, claims, and liabilities (collectively, "Claims") asserted by any other party in connection with the transactions contemplated by the Loan Documents; and (b) all losses or Bank Expenses incurred, or paid by Bank from, following, or arising from transactions between Bank and Borrower (including reasonable attorneys' fees and expenses), except for Claims and/or losses directly caused by Bank's gross negligence or willful misconduct.

12.3   Limitation of Actions.  Any claim or cause of action by Borrower against Bank, its directors, officers, employees, agents, accountants, attorneys, or any other Person affiliated with or representing Bank based upon, arising from, or relating to this Loan Agreement or any other Loan Document, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Bank, its directors, officers, employees, agents, accountants or attorneys, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court of competent jurisdiction by (a) the filing of a complaint within one year from the earlier of (i) the date any of Borrower's officers or directors had knowledge of the first act, the occurrence or omission upon which such claim or cause of action, or any part thereof, is based, or (ii) the date this Agreement is terminated, and (b) the service of a summons and complaint on an officer of Bank, or on any other person authorized to accept service on behalf of Bank, within thirty (30) days thereafter.  Borrower agrees that such one-year period is a reasonable and sufficient time for Borrower to investigate and act upon any such claim or cause of action.  The one-year period provided herein shall not be waived, tolled, or extended except by the written consent of Bank in its sole discretion.  This provision shall survive any termination of this Loan Agreement or any other Loan Document.

12.4   Time of Essence.  Time is of the essence for the performance of all Obligations in this Agreement.

12.5   Severability of Provisions.  Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

12.6   Amendments in Writing; Integration.  All amendments to this Agreement must be in writing signed by both Bank and Borrower.  This Agreement and the Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations between the parties about the subject matter of this Agreement and the Loan Documents merge into this Agreement and the Loan Documents.

12.7   Counterparts.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, are an original, and all taken together, constitute one Agreement.

12.8   Survival.  All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations (other that inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement) have been satisfied.  The obligation of Borrower in Section 12.2 to indemnify Bank shall survive until the statute of limitations with respect to such claim or cause of action shall have run.

12.9   Confidentiality.  In handling any confidential information, Bank shall exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made:  (a) to Bank's Subsidiaries or Affiliates; (b) to prospective transferees or purchasers of any

EXHIBIT A

interest in the Credit Extensions (provided, however, Bank shall use commercially reasonable efforts to obtain such prospective transferee's or purchaser's agreement to the terms of this provisions); (c) as required by law, regulation, subpoena, or other order; (d) to Bank's regulators or as otherwise required in connection with Bank's examination or audit; and (e) as Bank considers appropriate in exercising remedies under this Agreement. Confidential information does not include information that either: (i) is in the public domain or in Bank's possession when disclosed to Bank, or becomes part of the public domain after disclosure to Bank; or (ii) is disclosed to Bank by a third party, if Bank does not know that the third party is prohibited from disclosing the information.

    12.10 <u>Attorneys' Fees, Costs and Expenses</u>.  In any action or proceeding between Borrower and Bank arising out of or relating to the Loan Documents, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs and expenses incurred, in addition to any other relief to which it may be entitled.

  13. <u>Definitions</u>.

    13.1 <u>Definitions</u>.  As used in this Agreement, the following terms have the following meanings:

    "<u>Account</u>" is any "account" as defined in the Code with such additional to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to Borrower.

    "<u>Account Debtor</u>" is any "account debtor" as defined in the Code with such additions to such terms as may hereafter be made.

    "<u>Advance</u>" or "<u>Advances</u>" means an advance (or advances) under the Revolving Line.

    "<u>Affiliate</u>" of any Person is a Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners, and for any Person that is a limited liability company, that Person's managers and members.

    "<u>Agreement</u>" is defined in the preamble hereof.

    "<u>Availability Amount</u>" is (a) the lesser of (i) the Revolving Line or (ii) the Borrowing Base minus (b) the outstanding principal balance of any Advances.

    "<u>Available Cash Flow</u>" is earnings before depreciation, amortization, interest and lease expense of Borrower and its Subsidiaries.

    "<u>Bank</u>" is defined in the preamble hereof.

    "<u>Bank Expenses</u>" are all audit fees and expenses, costs, and expenses (including reasonable attorneys' fees and expenses) for preparing, negotiating, administering, defining and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings) or otherwise incurred with respect to Borrower.

    "<u>Bankruptcy-Related Defaults</u>" is defined in <u>Section 9.1</u>.

    "<u>Borrower</u>" is defined in the preamble hereof.

EXHIBIT A

"Borrower's Books" are all Borrower's books and records including ledgers, federal and state tax returns, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"Borrowing Base" is (a) 80% of Eligible Accounts, and 60% of Eligible Inventory as determined by Bank from Borrower's most recent Borrowing Base Certificate; provided, however, that Bank may decrease the foregoing percentages in its good faith business judgment based on events, conditions, contingencies, or risks which, as determined by Bank, may adversely affect Collateral.  Further, during the Overline Period the Overline Facility shall be added to the Borrowing Base.

"Borrowing Base Certificate" is that certain certificate in the form attached hereto as Exhibit D.

"Borrowing Certificate" is attached hereto as Exhibit E.

"Business Day" is any day that is not a Saturday, Sunday or a day on which Bank is closed.

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year form the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc., (c) Bank's certificates of deposit issued maturing no more than one (1) year after issue; and (d) money market funds at least ninety-five percent (95%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (c) of this definition.

"Code" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of Tennessee; provided, that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Bank's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of Tennessee, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes on the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"Collateral" is any and all properties, rights and assets of Borrower described on Exhibit A.

"Collateral Account" is any Deposit Account, Securities Account, or Commodity Account.

"Committed Availability" means, as the date of determination, an amount equal to the sum of the Revolving Line minus all outstanding Credit Extensions.

"Commodity Account" is any "commodity account" as defined in the Code with such additions to such term as may hereafter be made.

"Communication" is defined in Section 10.

"Compliance Certificate" is that certain certificate in the form attached hereto as Exhibit F.

"Contingent Obligation" is, for any Person, any direct or indirect liability, contingent or not, of that Person for (a) any indebtedness, lease, dividend, letter of credit or other obligation of another such as

17

EXHIBIT A

an obligation directly or indirectly guaranteed, endorsed, co-made, discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (b) any obligations for undrawn letters of credit for the account of that person; and (c) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"Control Agreement" is any control agreement entered into among the depository institution at which Borrower maintains a Deposit Account or the securities intermediary or commodity intermediary at which Borrower maintains a Securities Account or a Commodity account, Borrower, and Bank pursuant to which Bank obtains control (within the meaning of the Code) over such Deposit Account, Securities Account, or Commodity Account.

"Credit Extension" is any Advance, or any other extension of credit by Bank for Borrower's benefit.

"Default" means any event which with notice or passage of time or both, would constitute an Event of Default.

"Deferred Revenue" is all amounts received or invoiced in advance of performance under contracts and not yet recognized as revenue.

"Deposit Account" is any "deposit account" as defined in the Code with such additions to such terms as may hereafter be made.

"Designated Deposit Account" is Borrower's deposit account, account number 100073002361, maintained with Bank.

"Dollars," "dollars" and "$" each mean lawful money of the United States.

"Effective Date" is the date Bank executes this Agreement and as indicated on the signature page hereof.

"Eligible Accounts" are Accounts which arise in the ordinary course of Borrower's business that meet all Borrower's representations and warranties in Section 5.3.  Bank reserves the right, upon prior written notice to Borrower at any time and from time to time after the Effective Date, to adjust any of the criteria set forth below and to establish new criteria in its good faith business judgment.  Unless Bank agrees otherwise in writing, Eligible Accounts shall not include:

      (a)     Accounts for which the Account Debtor has not been invoiced;

      (b)     Accounts that the Account Debtor has not paid within sixty (60) days of invoice date;

      (c)     Accounts owing from an Account Debtor, fifty percent (50%) or more of whose Accounts have not been paid within sixty (60) days of invoice date;

18

EXHIBIT A

    (d)      Credit balances over sixty (60) days from invoice date;

    (e)      Accounts owing from an Account Debtor which does not have its principal place of business in the United States;

    (f)      Accounts owing from an Account Debtor which is a federal, government entity or any department, agency, or instrumentality thereof;

    (g)      Accounts owing from an Account Debtor to the extent that Borrower is indebted or obligated in any manner to the Account Debtor (as creditor, lessor, supplier or otherwise – sometimes called "contra" accounts payable, customer deposits or credit accounts), with the exception of customary credits, adjustments and/or discounts given to an Account Debtor by Borrower in the ordinary course of its business;

    (h)      Accounts for demonstration or promotional equipment, media promotions, or in which goods are consigned, or sold on a "sale Guaranteed", "Sale or return", "sale on approval", "bill and hold", or other terms if Account Debtor's payment may be conditional;

    (i)      Accounts for which the Account Debtor is Borrower's Affiliate, officer, employee, agent, sales representative or pro staff;

    (j)      Accounts in which the Account Debtor disputes liability or makes any claim (but only up to the disputed or claimed amount), or if the Account Debtor is subject to an Insolvency Proceeding, or becomes insolvent, or goes out of business;

    (k)      Accounts owing form an Account Debtor with respect to which Borrower has received deferred revenue (but only to the extent of such deferred revenue);

    (l)      Accounts for which Bank in its good faith business judgment determines collection to be doubtful; and

    (m)      other Accounts Bank deems ineligible in the exercise of its good faith business judgment.

"Eligible Inventory" is Inventory which is used in the ordinary course of Borrower's business. Bank reserves the right, upon prior written notice to Borrower to adjust any of the criteria set forth below and to establish new criteria in its good faith business judgment. Unless Bank agrees otherwise in writing, Eligible Inventory shall not include:

    (a)      Inventory that is unsold since January 1st of the prior fiscal year known as slow moving;

    (b)      Inventory that is returned items known as seconds;

    (c)      Inventory that is held or used by employees or salesmen;

    (d)      Inventory that is private label custom made for specific parties;

    (e)      Inventory that is used for display items;

EXHIBIT A

(f)      Inventory that is used for shipping and packing materials;

(g)      Inventory that is obsolete, damaged or unsalable; and

(h)      Other Inventory Bank deems ineligible in the exercise of its good faith business judgment;

"Equipment" is all "equipment" as defined in the Code with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"ERISA" is the Employment Retirement Income Security Act of 1974, and its regulations.

"Event of Default" is defined in Section 8.

"Event of Loss" is defined in Section 2.1.3(c).

"Fixed Charges" is the current portion of long term debt plus interest expense and lease expense of Borrower and its Subsidiaries.

"Funding Date" is any date on which a Credit Extension is made to or on account of Borrower which shall be a Business Day.

"GAAP" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"General Intangibles" is all "general intangibles" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation, all copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, any patents, trademarks, service marks and, to the extent permitted under applicable law, any applicable law, any applications therefore, whether registered or not, any trade secret rights, including any rights to unpatented inventions, payment intangibles, royalties, contract rights, goodwill, franchise agreements, purchase orders, customer lists, route lists, telephone numbers, domain names, claims, income and other tax refunds, security and other deposits, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"Guaranties" means those certain guaranty agreements executed by Guarantors in favor of Bank dated the Effective Date.

"Guarantors" are Allen Hughes and Thomas Matthews.

"Indebtedness" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b)

20

EXHIBIT A

obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, and (d) Contingent Obligations.

"Insolvency Proceeding" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"Intellectual Property" is defined in the IP Agreement.

"Interest Expense" means for any fiscal period, interest expense (whether cash or non-cash) determined in accordance with GAAP for the relevant period ending on such date, including, in any event, interest expense with respect to any Credit Extension and other Indebtedness of Borrower and its Subsidiaries, including, without limitation or duplication, all commissions, discounts, or related amortization and other fees and charges with respect to letters of credit and bankers' acceptance financing and the net costs associated with interest rate swap, cap, and similar arrangements, and the interest portion of any deferred payment obligation (including leases of all types).

"Inventory" is all "inventory" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"Investment" is any beneficial ownership interest in any Person (including stock partnership interest or other securities), and any loan, advance or capital contribution to any Person.

"IP Agreement" is that certain Intellectual Property Security Agreement executed and delivered by Borrower to Bank dated as of the Effective Date.

"Lien" is a mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Loan Documents" are, collectively, this Agreement, the Perfection Certificate, the Revolving Promissory Note, the Term Promissory Note, the Guaranties, the IP Agreement, any note, or notes or guaranties executed by Borrower, and any other present or future agreement between Borrower and/or for the benefit of Bank in connection with this Agreement, all as amended, restated, or otherwise modified.

"Material Adverse Change" is (a) a material impairment in the perfection or priority of Bank's Lien in the Collateral or in the value of such Collateral; (b) a material adverse change in the business, operations, or condition (financial or otherwise) of Borrower; (c) a material impairment of the prospect of repayment of any portion of the Obligations or (d) Bank determines, based upon information available to it and in its reasonable judgment, that there is a reasonable likelihood that Borrower shall fail to comply with one or more of the financial covenants in Section 6 during the next succeeding financial reporting period.

"Obligations" are Borrower's obligation to pay when due the Revolving Promissory Note, the Term Promissory Note, any debts, principal, interest, Bank Expenses and other amounts Borrower owes Bank now or later, whether under this Agreement, the Loan Documents, or otherwise, including, without limitation, all obligations relating to letters of credit, cash management services, and foreign exchange contracts, if any, and including interest accruing after Insolvency Proceedings begin and debts, liabilities,

EXHIBIT A

or obligations of Borrower assigned to Bank, and the performance of Borrower's duties under the Loan Documents.

"Operating Documents" are, for any Person, such Person's formation documents, as certified with the Secretary of State of such Person's state of formation on a date that is no earlier than 30 days prior to the Effective Date, and, (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership, its partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

"Overline Facility" is up to $1,000,000.00 of funds available in excess of $7,000,000.00 under the Revolving Line during the Overline Period.

"Overline Period" means the time periods from Effective Date through September 30, 2008, March 1, 2009 through September 30, 2009 and from March 1, 2010 through June 5, 2010.

"Perfection Certificate" is defined in Section 5.1.

"Permitted Indebtedness" is:

    (a)    Borrower's Indebtedness to Bank under this Agreement and the other Loan Documents;

    (b)    Indebtedness existing on the Effective Date and shown on the Perfection Certificate;

    (c)    Subordinated Debt;

    (d)    unsecured Indebtedness to trade creditors incurred in the ordinary course of business;

    (e)    Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

    (f)    Indebtedness secured by Permitted Liens;

    (g)    extensions, refinancings, modifications, amendments and restatements of any items of Permitted Indebtedness (a) through (f) above, provided that the principal amount thereof is not increased or the terms thereof are not modified to impose more burdensome terms upon Borrower or its Subsidiary, as the case may be; and

    (h)    additional Indebtedness not to exceed $100,000.00 in the aggregate.

"Permitted Investments" are:

    (a)    Investments shown on the Perfection Certificate and existing on the Effective Date;

    (b)    Cash Equivalents;

EXHIBIT A

(c)     Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of Borrower;

(d)     Investments consisting of deposit accounts in which Bank has a perfected security interest;

(e)     Investments accepted in connection with Transfers permitted by Section 7.1;

(f)     Investments consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business, and (ii) loans to employees, officers or directors relating to the purchase of equity securities of Borrower or its Subsidiaries pursuant to employee stock purchase plans or agreements approved by Borrower's Board of Directors;

(g)     Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business; and

(h)     Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business; provided that this paragraph (h) shall not apply to Investments of Borrower in any Subsidiary.

"Permitted Liens" are:

(a)     Liens existing on the Effective Date and shown on the Perfection Certificate or arising under this Agreement and the other Loan Documents;

(b)     Liens for taxes, fees, assessments or other government charges or levies, either not delinquent or being contested in good faith and for which Borrower maintains adequate reserves on its Books, if they have no priority over any of Bank's Liens;

(c)     purchase money Liens (i) on Equipment acquired or held by Borrower incurred for financing the acquisition of the Equipment, or (ii) existing on Equipment when acquired, if the Lien is confined to the property and improvements and the proceeds of the Equipment.

(d)     Liens incurred in the extension, renewal or refinancing of the indebtedness secured by Liens described in (a) through (c), but any extension, renewal or replacement Lien must be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness may not increase;

(e)     leases or subleases of real property granted in the ordinary course of business, and leases, subleases, non-exclusive licenses or sublicenses of property (other than real property or Intellectual Property) granted in the ordinary course of Borrower's business, if the leases, subleases, licenses and sublicenses do not prohibit granting Bank a security interest;

(f)     non-exclusive license of Intellectual Property granted to third parties in the ordinary course of business, and licenses of Intellectual Property could not result in a legal transfer of title of the licensed property that may be exclusive in respects other than territory and

23

EXHIBIT A

that may be exclusive as to territory only as to discreet geographical areas outside of the United States; and

(g)     Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 8.4 or 8.7.

"Person" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"Responsible Officer" is any of the Chief Executive Office, President, Chief Financial Officer and Controller of Borrower.

"Revolving Line" is an Advance or Advances in an aggregate amount of up to $7,000,000.00 outstanding at any time from October 1st through the end of February annually and up to $8,000,000.00 during the Overline Period.

"Revolving Promissory Note" is that certain revolving promissory note in the amount of $8,000,000.00 dated the Effective Date executed by Borrower and payable to Bank.

"Revolving Line Maturity Date" is June 5, 2010.

"Securities Account" is any "securities account" as defined in the Code with such additions to such terms as may hereafter be made.

"Subordinated Debt" is indebtedness incurred by Borrower subordinated to all of Borrower's now or hereafter indebtedness to Bank (pursuant to a subordination, intercreditor, or other similar agreement in form and substance satisfactory to Bank entered into between Bank and the other creditor), on terms acceptable to Bank.

"Subsidiary" means, with respect to any Person of which more than 50% of the voting stock or other equity interests is owned or controlled, directly or indirectly, by such Person or one or more Affiliates of such Person.

"Tangible Net Worth" is, on any date, the consolidated total assets of Borrower and its Subsidiaries minus (a) Total Liabilities, minus (b) intangible items including unamortized debt discount and expense, patents, trade and service marks and names, copyrights and research and development expenses except prepaid expenses, plus (c) Subordinated Debt.

"Term Promissory Note" is that certain term promissory note in the amount of $500,000.00 dated the Effective Date executed by Borrower and payable to Bank.

"Total Liabilities" is on any day, obligations that should, under GAAP, be classified as liabilities on Borrower's consolidated balance sheet, including all Indebtedness, and current portion of Subordinated Debt permitted by Bank to be paid by Borrower, but excluding all other Subordinated Debt.

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**BORROWER:**

AVERY OUTDOORS, INC.

By: _____
      Allen Hughes, Vice President

**BANK:**

SUNTRUST BANK

By: _____
      ~~Duncan Galbreath~~, Vice President
      RYAN PARRY

Effective Date: June 11, 2008

25

EXHIBIT A

## Exhibit "A"

The Collateral consists of all of Borrower's right, title and interest in and to the following personal property:

All goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

All Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

Exhibit A

EXHIBIT A

Exhibit "B"

## LOAN PAYMENT/ADVANCE REQUEST FORM

[INTENTIONALLY OMITTED]

Exhibit B

EXHIBIT A

**Exhibit "C"**

**[INTENTIONALLY OMITTED]**

Exhibit C

EXHIBIT A

Exhibit "D"

BORROWING BASE CERTIFICATE

[SEE ATTACHED]

Exhibit D

EXHIBIT A

Exhibit "E"

CORPORATE BORROWING CERTIFICATE

[SEE ATTACHED]

Exhibit E

EXHIBIT A

Exhibit "F"

## COMPLIANCE CERTIFICATE

TO:   SunTrust Bank                                    Date: _____

FROM: Avery Outdoors, Inc.

      The undersigned authorized officer of Avery Outdoors, Inc. ("Borrower") certifies that under the terms and conditions of the Loan and Security Agreement between Borrower and Bank (the "Agreement"), (1) Borrower is in complete compliance for the period ending _____ with all required covenants except as noted below, (2) there are no Events of Default, (3) all representations and warranties in the Agreement are true and correct in all material respects on this date except as noted below; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date, (4) Borrower, and each of its Subsidiaries, has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except as otherwise permitted pursuant to the terms of Section 5.9 of the Agreement, and (5) no Liens have been levied or claims made against Borrower or any of its Subsidiaries relating to unpaid employee payroll or benefits of which Borrower has not previously provided written notification to Bank.  Attached are the required documents supporting the certification.  The undersigned certifies that these are prepared in accordance with generally GAAP consistently applied from one period to the next except as explained in an accompanying letter or footnotes.  The undersigned acknowledges that no borrowings may be requested at any time or date of determination that Borrower is not in compliance with any of the terms of the Agreement, and that compliance is determined not just at the date this certificate is delivered.  Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

Please indicate compliance status by circling Yes/No under "Complies" column.

| Reporting Covenant | Required | Complies |
|---|---|---|
| Monthly financial statements | N/A | Yes  No |
| Annual financial statement  + CC | FYE within 120 days | Yes  No |
| Borrowing Base Certificate A/R & A/P Agings | Monthly within 15 days | Yes  No |

The following Intellectual Property was registered after the Effective Date (if no registrations, state "None")

_____

_____

| Financial Covenant | Required | Actual | Complies |
|---|---|---|---|
| Maintain on an Annual Basis: | | | |
| Maximum Liability to Tangible Net Worth: | 2.5 :1.0 | _____ : 1.0 | Yes  No |

      The following financial covenant analyses and information set forth in Schedule 1 attached hereto are true and accurate as of the date of this Certificate.

      The following are the exceptions with respect to the certification above:  (If no exceptions exist, state "No exceptions to note.") _____

_____

EXHIBIT A

Avery Outdoors, Inc.

By: _____
Name: _____
Title: _____

| BANK USE ONLY |
| --- |
| Received by: _____ |
| AUTHORIZED SIGNER |
| Date: _____ |
| Verified: _____ |
| AUTHORIZED SIGNER |
| Date: _____ |
| Compliance Status:      Yes     No |

Exhibit F

**EXHIBIT A**

**Exhibit "G"**

PERFECTION CERTIFICATE

[SEE ATTACHED]

6825911.4

**EXHIBIT A**

## EXHIBIT "A"

The Collateral consists of all of Borrower's right, title and interest in and to the following personal property:

All goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

All Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

**EXHIBIT A**

EXHIBIT D
BORROWING BASE CERTIFICATE

BORROWER:
LENDER:                                    AVERY OUTDOORS, INC.
COMMITMENT AMOUNT:                         SUNTRUST BANK
                                           $8,000,000.00 *

ACCOUNTS RECEIVABLE (Trade A/R Only)

                                                        Month (Period) Ending      05/31/2008

1. Accounts Receivable Beginning of Month G/L Balance
2. Add: Gross Sales for the Month (Period)                                         $2,220,239.08
3. Add: Debit Memos, Returned Checks, Other Debit Adjustments                       $914,208.54
4. Less: Net Cash Collections for the Month (Period)
5. Less: Credit Memos, Discounts, Other Credit Adjustments                         ($487,037.62)
6. End of Month (or Period) G/L Balance                                           $2,647,410.00
7. A/R Aging Balance                                                              $2,642,691.08

        Variance, if any (Line 6 minus Line 7)                                       $4,718.92
8. Less: Ineligible A/R (Per Attached Sch A) Month Ending          05/31/2008      ($830,074.57)
9. Net Eligible Accounts Receivable (Line 7 Aging Balance minus Line 8)           $1,817,335.43
10. A/R Availability (80% of Line 9)                                              $1,453,868.34

INVENTORY
11. Inventory Balance Month Ending
12. Less: Ineligible Inventory (Per Attached Sch B)                05/31/2008      $5,291,351.24
13. Eligible Inventory (Line 10 minus Line 11)                                    ($277,232.76)
14. Inventory Availability (60% of Line 13)                                       $5,014,118.48
                                                                                 $3,008,471.09
15. TOTAL ELIGIBLE COLLATERAL (Line 10 plus Line 14)                              $4,462,339.43

BALANCES
16. Maximum Loan Amount ($7,000,000 if Oct 1 - Feb 28  OR  $8,000,000 if March 1 -Sept. 30th)

17. Total Eligible Collateral (Line 15)                                           $8,000,000.00 *
18. Overline Facility; add $1,000,000 in availability during March 1 - Sept. 30th.  $4,462,339.43
19. Total Eligible Collateral plus available Overline Facility (Line 17 + Line 18)  $1,000,000.00
                                                                                 $5,462,339.43
19. Total Funds Available (Lesser of Line 16 or Line 19)                          $5,462,339.43
20. Present balance owing on Line of Credit                                       $4,189,008.67
21. RESERVE POSITION (Line 17 minus Line 18 )                                     $1,273,330.76

The undersigned represents and warrants that this is true, complete and correct, and that the information in this Borrowing Base Certificate complies with the representation and warranties in the Loan and Security Agreement between the undersigned and SunTrust Bank.

COMMENTS:
AVERY OUTDOORS, INC.

_Kelli Fly_
Authorized Signer
Date: 06/05/2008

*Max Loan Amount is $7,000,000 if Date above is Oct 1 - Feb 28
OR = $8,000,000 if Date above is March 1 -Sept. 30th.

| BANK USE ONLY | |
|---|---|
| Received by: | |
| | Authorized Signer |
| Date: | |
| Verified | |
| Date: | Authorized Signer |
| Compliance Status: | Yes ____ No ____ |

EXHIBIT A

**AVERY OUTDOORS, INC.**
**SCHEDULE A**
TRADE A/R INELIGIBLES

MONTH ENDING:      05/31/2008

| | |
|---|---:|
| Past Due (over 90 days from Invoice Date or over 60 days from Due Date) | $747,529.17 |
| Credit Balances in Past Dues | |
| 50% Cross Aging | $82,545.40 |
| Government | |
| Affiliates/Employees (within the Trade A/R) | |
| Contra | |
| Foreign | |
| Cash/COD's | |
| Finance/Service Charges | |
| Pre-Billings/Bill and Hold/Consignments | |
| Bankrupt/Credit Holds | |
| Other as Bank deems ineligible | |
| **TOTAL TRADE ACCOUNTS RECEIVABLE INELIGIBLES** | $830,074.57 |
| (Total Automatically Transfers To Line 8 of Borrowing Certificate) | |

**EXHIBIT A**

**AVERY OUTDOORS, INC.**
**SCHEDULE B**
**INVENTORY INELIGIBLES**

MONTH ENDING: __MM/DD/YYYY__

| | | (Avery Classification) |
|---|---|---|
| Consignments | | |
| Custom/Private Label | $9,403.08 | Co. generated report |
| Displays/Packing and Shipping Materials | $9,305.42 | Whse 38 - Memphis SEC |
| Obsolete, Unsalable, Damaged, Defective, Discontinued | ($867.17) | Whse 36 - Trash |
| Salesmen Held (i.e. samples/demos for trade shows) | $25,231.17 | Whse 03 - TM's |
| Seconds (returned items that are not 1st quality; can be sold at discount) | $1,126.70 | Whse 90 - SEC |
| Seconds (returned items that are not 1st quality; can be sold at discount) | $80,573.20 | Whse 99 - CFV Seconds |
| Slow Moving (Items not sold since January 1st of prior year) | $152,460.36 | Co. generated report |
| Work in Process | | |
| Other as Bank deems ineligible | | |
| | | |
| **TOTAL INVENTORY INELIGIBLES** | $277,232.76 | |
| (Total Automatically Transfers To Line 12 of Borrowing Certificate) | | |

**EXHIBIT A**

**EXHIBIT D**
**BORROWING BASE CERTIFICATE**

BORROWER:                                    AVERY OUTDOORS, INC.
LENDER:                                      SUNTRUST BANK
COMMITMENT AMOUNT:                           $8,000,000.00 *

ACCOUNTS RECEIVABLE (Trade A/R Only)              Month (Period) Ending ____ mm/dd/yyyy

| | |
|---|---|
| 1. Accounts Receivable Beginning of Month G/L Balance | |
| 2. Add:  Gross Sales for the Month (Period) | |
| 3. Add:  Debit Memos, Returned Checks, Other Debit Adjustments | |
| 4. Less:  Net Cash Collections for the Month (Period) | |
| 5. Less:  Credit Memos, Discounts, Other Credit Adjustments | |
| 6. End of Month (or Period) G/L Balance | $0.00 |
| 7. A/R Aging Balance | |
| Variance, if any (Line 6 minus Line 7) | $0.00 |
| 8. Less:  Ineligible A/R (Per Attached Sch A) Month Ending ____ mm/dd/yyyy | $0.00 |
| 9. Net Eligible Accounts Receivable (Line 7 Aging Balance minus Line 8) | $0.00 |
| 10. A/R Availability (80% of Line 9) | $0.00 |

INVENTORY

| | |
|---|---|
| 11. Inventory Balance Month Ending ____ mm/dd/yyyy | |
| 12. Less:  Ineligible Inventory (Per Attached Sch B) | $0.00 |
| 13. Eligible Inventory (Line 10 minus Line 11) | $0.00 |
| 14. Inventory Availability (60% of Line 13) | $0.00 |
| 15. TOTAL ELIGIBLE COLLATERAL (Line 10 plus Line 14) | $0.00 |

BALANCES

| | |
|---|---|
| 16. Maximum Loan Amount ($7,000,000 if Oct 1 - Feb 28  OR  $8,000,000 if March 1 -Sept. 30th) | $8,000,000.00 * |
| 17. Total Eligible Collateral (Line 15) | $0.00 |
| 18. Overline Facility; add $1,000,000 in availability during March 1 - Sept. 30th. | $0.00 |
| 19. Total Eligible Collateral plus available Overline Facility (Line 17 + Line 18) | $0.00 |
| 19. Total Funds Available (Lesser of Line 16 or Line 19) | $0.00 |
| 20. Present balance owing on Line of Credit | |
| 21. RESERVE POSITION (Line 17 minus Line 18 ) | $0.00 |

*The undersigned represents and warrants that this is true, complete and correct, and that the information in this Borrowing Base Certificate complies with the representation and warranties in the Loan and Security Agreement between the undersigned and SunTrust Bank.*

COMMENTS:
AVERY OUTDOORS, INC.

| BANK USE ONLY | |
|---|---|
| Received by: | |
| | Authorized Signer |
| Date: | |
| Verified | |
| | Authorized Signer |
| Date: | |
| Compliance Status: | Yes ____  No ____ |

By: _____
          Authorized Signer

Date: _____

*Max Loan Amount = $7,000,000 if Date above is Oct 1 - Feb 28

OR  = $8,000,000 if Date above is March 1 -Sept. 30th.

# EXHIBIT A

AVERY OUTDOORS, INC.

SCHEDULE A

TRADE A/R INELIGIBLES

MONTH ENDING:   MM/DD/YYYY

| | |
|---|---|
| Past Due (over 90 days from Invoice Date or over 60 days from Due Date) | _____ |
| Credit Balances in Past Dues | _____ |
| 50% Cross Aging | _____ |
| Government | _____ |
| Affiliates/Employees (within the Trade A/R) | _____ |
| Contra | _____ |
| Foreign | _____ |
| Cash/COD's | _____ |
| Finance/Service Charges | _____ |
| Pre-Billings/Bill and Hold/Consignments | _____ |
| Bankrupt/Credit Holds | _____ |
| Other as Bank deems ineligible | _____ |

**TOTAL TRADE ACCOUNTS RECEIVABLE INELIGIBLES**            $0.00

(Total Automatically Transfers To Line 8 of Borrowing Certificate)

EXHIBIT A

**AVERY OUTDOORS, INC.**

**SCHEDULE B**

**INVENTORY INELIGIBLES**

MONTH ENDING:   __MM/DD/YYYY__

_(Avery Classification)_

| | | |
|---|---|---|
| Consignments | | |
| Custom/Private Label | _____ | _Co. generated report_ |
| Displays/Packing and Shipping Materials | _____ | _Whse 38 - Memphis SEC_ |
| Obsolete, Unsalable, Damaged, Defective, Discontinued | _____ | _Whse 36 - Trash_ |
| Salesmen Held (i.e. samples/demos for trade shows) | _____ | _Whse 03 - TM's_ |
| Seconds (returned items that are not 1st quality; can be sold at discount) | _____ | _Whse 90 - SEC_ |
| Seconds (returned items that are not 1st quality; can be sold at discount) | _____ | _Whse 99 - CFV Seconds_ |
| Slow Moving (Items not sold since January 1st of prior year) | _____ | _Co. generated report_ |
| Work in Process | _____ | |
| Other as Bank deems ineligible | _____ | |

**TOTAL INVENTORY INELIGIBLES**                                $0.00

**(Total Automatically Transfers To Line 12 of Borrowing Certificate)**

**EXHIBIT A**

April 22, 2015

**VIA E-MAIL AND OVERNIGHT MAIL**
Avery Outdoors, Inc.
c/o Harris Shelton Hanover Walsh, PLLC
One Commerce Square
40 S. Main Street
Memphis, TN 38103-2555
Attention: John L. Ryder
jryder@harrisshelton.com

Thomas Matthews
c/o Law Office of Edward Bearman
780 Ridge Lake Blvd., Suite 102
Memphis, TN 38120
Attn: Edward Bearman Esq.
ebearman@jglawfirm.com

Allen Hughes, Jr.
c/o Philip E. Mischke
9999 S. Shady Grove Road, Suite 500
Memphis, TN 38120
pmischke@farris-law.com

      Re:    Payoff and Reservation of Rights

Gentlemen:

      Reference is hereby made to that certain (a) Amended and Restated Loan and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") dated as of November 29, 2010 between Avery Outdoors, Inc. ("Borrower") and SunTrust Bank ("SunTrust"), (b) Amended and Restated Revolving Promissory Note (as amended, restated, supplemented or otherwise modified from time to time, the "Note") dated as of November 29, 2010 by Borrower in favor of SunTrust in the original principal amount of $6,000,000, and (c) Assignment of Promissory Notes and Loan Documents (the "Assignment") between SunTrust and Outdoors Acquisition Co LLC ("Lender") dated as of April 2, 2015 whereby Sun Trust assigned all of its right title and interest in the Loan Agreement, the Note, the Loans (as defined therein) and the other Loan Documents (as defined therein) to Lender. Capitalized terms or matters of construction defined or established in the Loan Agreement or the Assignment, as applicable and shall be applied herein as defined or established therein.

      The Note matured on November 1, 2014 and on such date, all amounts under the Note and all of Borrower's other obligations under the Note, the Loan Agreement and the other Loan Documents became due and immediately payable.

      As of April 2, 2015, except for the contingent indemnification obligations, the indebtedness and other obligations of the Borrower to Lender under the Note totaled $1,544,997.03, consisting of the components set forth in the table below.

DM_US 60427538.4.092619.0018

**EXHIBIT B**

Avery Outdoors, Inc.
April 22, 2015
Page 2

| Components of Payoff Amount | As of April 2, 2015 |
|---|---|
| Principal | $1,461,394.94 |
| Interest | $7,299.50 |
| Other Fees and Expenses | $76,302.59 |
| TOTAL[1] | $1,544,997.03 |

Since April 2, 2015, interest up to the maximum rate allowed by law in accordance with the terms of the Note has continued to accrue and additional fees and expenses (including without limitation attorneys' fees and expenses) have been incurred.

Payoff of amounts owed under the Note and the Borrower's other obligations under the Note, the Loan Agreement and the other Loan Documents should be made to Lender immediately by wire transfer of United States dollars in immediately available funds in accordance with the following wire instructions:

**Outdoors Acquisition Co LLC**
13413 Galleria Circle, Q-300
Austin, TX 78738
Wells Fargo Bank, NA
420 Montgomery Street
San Francisco, CA 94104
ABA Routing # 121000248
Account # 4234943314

This letter shall not be construed as a waiver of any existing default or event of default and shall not be construed as, or deemed to be, the exclusive remedy of Lender, but rather cumulative with and in addition to the other rights and remedies Lender possesses under the Loan Agreement, the Note, the other Loan Documents and applicable law. Lender expressly reserves all of its rights, remedies, claims and causes of actions which Lender may possess against Borrower and any related parties or guarantors under the Loan Agreement, the Note, the other Loan Documents and applicable law.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

---

[1] Amount is exclusive of contingent indemnification obligations.

DM_US 60427538-4.092619.0018

Avery Outdoors, Inc.
April 22, 2015
Page 3

       Please contact us if you have any questions regarding any of the matters addressed in this letter.

       Sincerely,

       OUTDOORS ACQUISITION CO LLC

By: _____
Name: _Jung Choi_
Title: _Chief Financial Officer_

**BURR** • • • **FORMAN** LLP

*results matter*

Robert C. Goodrich Jr.
bgoodrich@burr.com
Direct Dial: (615) 724-3212

700 Two American Center
3102 West End Avenue
Nashville, TN 37203

*Office* (615) 724-3200
*Fax* (615) 724-3290
*Toll-free* (866) 489-8542

**BURR.COM**

April 22, 2015

VIA EMAIL JRYDER@HARRISSHELTON.COM

John L. Ryder
Harris Shelton Hanover & Walsh, PLLC
One Commerce Square
Suite 2700
Memphis, TN 38103-2555

Re:   **SunTrust v. Avery Outdoors, et al.**
      **Case No. CH-14-1667-1**

Dear John:

On November 13, 2014, SunTrust Bank filed a Verified Complaint seeking, inter alia, the appointment of a Receiver for Avery Outdoors, Inc., Case No. CH-14-16767, Chancery Court for Shelby County, Tennessee ("Receivership Action"). You were appointed Receiver on November 14, 2015, and since that time you have endeavored to maintain the business and its operations in challenging circumstances.

After filing the Verified Complaint, SunTrust Bank transferred the "Note" as defined in the Verified Complaint, along with the loan documents executed in connection therewith and its security interests in the "Collateral" as defined in the Verified Complaint to our client Outdoors Acquisition Co LLC, a Delaware limited liability company. Outdoors Acquisition Co LLC has been working with you in a mutual effort to protect the Collateral and the business, with the anticipation of a sale of the assets by you. Recently it became apparent to you, and you communicated to Outdoors Acquisition Co LLC, that the business needs a substantial infusion of cash over the next three months, over $3 million, to continue operations. Neither Outdoors Acquisition Co LLC nor any other person or entity of which we are aware is willing to make such a cash infusion. This exigency creates the need for expeditious action to protect the Collateral and the business.

Under paragraph 34 of the *Order Confirming Appointment of Receiver* entered on December 12, 2014, in the Receivership Action, Outdoors Acquisition Co LLC's rights to exercise its remedies under the "Loan Documents" as defined in the Verified Complaint are unimpaired. Those rights include the right to conduct a public sale of the Collateral in accordance with T.C.A. section 9-101 *et seq.*

23317350 v1

**EXHIBIT C**

John L. Ryder
April 22, 2015
Page 2

Given current circumstances, Outdoors Acquisition Co LLC intends to conduct a public sale of the Collateral on May 11, 2015, to be held at the Chancery Court. You have a list of interested buyers, and it is our hope that you will provide them prompt notice of the sale and take whatever other actions you deem necessary to solicit bids and to help create a commercially reasonable disposition of the Collateral. Outdoors Acquisition Co LLC wants to make this a cooperative disposition effort with you as Receiver.

Although Outdoors Acquisition Co LLC does not require a court order to proceed, we encourage you to seek court approval for the process.

Yours truly,

*Bob*

Robert C. Goodrich Jr.

RCG/sts

23317350 v1

**Avery Outdoors, Inc.**
*Principal, accrued interest and fees through 5/8/2015*

| Principal & Accrued Interest as of 4/2/2015 | Legal / Other Fees Through 4/2/2015 | Legal / Other Fees (1) 4/2-5/8/2015 | Accrued Interest (2) 4/2-5/8/2015 | Total |
|---|---|---|---|---|
| $1,484,198.33 | $76,302.59 | $385,210.29 | $9,804.32 | $1,955,515.53 |

*(1) Legal and other fees continue to accrue and can be updated at the date of payoff.*
*(2) Interest accruing at rate of 6.4067%.*

|  | Estimate as of 5/8/15 |
|---|---|
| McDermott, Will & Emery | 90,000.00 |
| Burr Forman | 65,000.00 |
| Mackinac Partners | 68,056.12 |
| Sprock Capital Advisory | 40,000.00 |
| Outdoor Acquisition Co Expenses | 20,000.00 |
| Collateral Evaluation & Assessment Fee | 100,000.00 |
| Late Fee on Interest | 2,154.17 |
| **Total Fees** | **385,210.29** |

**EXHIBIT D**